*Jonathan Torin Kidder v. State of Maryland*
No. 53, September Term 2020


**Criminal Procedure – Right to an Impartial Jury – Jury Selection.** Article 21 of the Maryland Declaration of Rights and the Sixth Amendment to the federal Constitution both guarantee a defendant charged with a serious crime the right to a trial by an impartial jury drawn from a fair cross-section of the community, although that does not mean that a jury must contain representatives of all the economic, social, religious, racial, political, and geographical groups of the community. The process used to select a jury must meet the constitutional standard.

**Criminal Procedure – Jury Selection.** Maryland Code, Courts and Judicial Proceedings Article, §8-404(b) was enacted to implement the constitutional right to an impartial jury. A jury selection method that involves the systematic or intentional exclusion of a cognizable group does not comply with that statute.

**Criminal Procedure – Jury Selection – Discretion of Trial Judge.** The Maryland Rules and applicable statutes provide that a trial judge has discretion in directing the process for selection of a jury in a criminal case. So long as that process complies with applicable constitutional standards, an appellate court reviews that process for abuse of discretion.

**Criminal Procedure – Right to an Impartial Jury – Jury Selection – Exclusion of Cognizable Group.** A defendant who asserts that the jury selection process employed at the defendant's trial violated the right to an impartial jury has the burden of demonstrating that the jury selection process involved the systematic or intentional exclusion of a cognizable group.

**Criminal Procedure – Right to an Impartial Jury – Jury Selection.** A defendant did not carry his burden of showing that his constitutional right to an impartial jury was violated because he did not show that any prospective jurors were excluded from his jury by a trial court's jury selection method without being excused for cause or by peremptory strike. Even assuming any prospective jurors were excluded, the defendant failed to show the systematic or intentional exclusion of any cognizable group.

IN THE COURT OF APPEALS
OF MARYLAND

No. 53

September Term, 2020

_____

JONATHAN TORIN KIDDER

V.

STATE OF MARYLAND

_____

Barbera, C.J.,
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Opinion by McDonald, J.
Watts and Getty, JJ., dissent.

_____

Filed: August 4, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

One who is charged with a serious crime has a constitutional right to trial by an impartial jury. That right has long been understood to implicitly require that a jury be selected from a fair cross-section of the community. The fair cross-section requirement does not mean that a jury must precisely mirror the demographics of the community. Rather, there must be no systematic or intentional exclusion of any cognizable group in the jury selection process. This appeal concerns whether a particular method of selecting a jury violates that standard.

Petitioner Jonathan Torin Kidder was charged in the Circuit Court for Worcester County with numerous criminal offenses related to a drunk driving incident in 2018 that resulted in the death of a cyclist. To select a jury for the trial, the trial judge posed a series of *voir dire* questions to the entire jury venire – the panel of prospective jurors summoned for the trial. *Voir dire* questions are designed to elicit information that might reveal cause to excuse members of the venire from service on the particular jury. The trial judge asked the members of the venire to indicate whether they had a response to each question and took note of each prospective juror who did so, without immediately questioning individual members of the panel as to their answers to assess possible challenges to exclude each of those prospective jurors for cause. Instead, after posing all of the *voir dire* questions, the judge determined the number of prospective jurors who had not responded to any of the questions – and therefore would not be subject to challenges for cause. The trial judge then calculated the total number of prospective jurors needed to seat a jury (taking into account the peremptory strikes the parties were entitled to exercise). Next, the trial judge conducted individual questioning of the panel members and considered challenges for cause, only to

the extent necessary to obtain the requisite number of prospective jurors for the exercise of peremptory strikes.

The jury found Mr. Kidder guilty of all charges. Mr. Kidder appealed that verdict, asserting, among other things, that the method of jury selection used by the trial judge violated his right to an impartial jury. He argues that the trial judge impermissibly excluded numerous groups of people from his jury without making specific findings of bias or other cause.

The Court of Special Appeals affirmed Mr. Kidder's convictions, and so do we. There is no indication in the record that any cognizable group was excluded from the jury as a result of the method of jury selection. Prospective jurors were *excluded* from consideration for the jury only if excused for cause or by peremptory strike. As in any case in which the venire consists of many more individuals than are needed for the jury, the selection process never reached some members of the venire, but that does not mean they were "excluded" from the jury. Nonetheless, while this selection method may appear more efficient than other methods of jury selection and a trial judge does not know in advance which particular members of the jury venire will – or will not – have a response to a *voir dire* question, trial judges should refrain from using it. This selection method uses a criterion for re-ordering the jury panel – silence in response to initial *voir dire* questions – that, though neutral on its face, may result in a jury that, though impartial, may not be as attentive and engaged as we want our juries to be.

# I

## Jury Selection in Criminal Trials

### A.    *Right to Impartial Jury*

Both Article 21 of the Maryland Declaration of Rights and the Sixth Amendment to the federal Constitution guarantee a defendant charged with a serious crime the right to an impartial jury – a right sometimes traced to the Magna Carta of 1215.  *Duncan v. Louisiana*, 391 U.S. 145, 151-52 (1968).  That right implicitly requires that the jury venire – the panel of prospective jurors from which the jury for a particular trial is selected – be drawn from a fair cross-section of the community.  *Holland v. Illinois*, 493 U.S. 474, 480 (1990); *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975).  However, there is no requirement that a jury chosen for a particular case "must mirror the community and reflect the various distinctive groups in the population."  *Taylor*, 419 U.S. at 538.  "Indeed, it would be impossible to apply a concept of proportional representation to the petit jury in view of the heterogeneous nature of our society."  *Batson v. Kentucky*, 476 U.S. 79, 85 n.6 (1986).

### B.    *Jury Plans, Pools, and Panels*

State law implements the constitutional directives.  The circuit court in each county is to have a plan for creating a jury pool from a "fair cross section of the adult citizens" who reside in the county.  Maryland Code, Courts & Judicial Proceedings Article ("CJ"), §§8-104, 8-201.  Under the plan, the circuit court's jury commissioner is to select names of individuals to serve in the court's jury pool for a particular interval.  CJ §8-310.  Each individual selected for an interval is generally assigned a number which is used to identify the individual during a jury selection process.  Procedures differ in their precise details

3

among different jurisdictions. On days when trials are scheduled in a circuit court, a sufficient number of individuals from the jury pool, taking into account the number anticipated to be needed, is summoned to the courthouse, and then, as needed, may be directed to a courtroom for the jury selection process in a particular trial. CJ §8-401. In this opinion, we shall refer to the members of the jury pool summoned to the courthouse and sent to a courtroom for a particular trial as the venire or jury panel for that case. We shall refer to members of a venire as "prospective jurors."[1]

## C. Jury Selection at Trial

A criminal trial begins with the selection of the jury. That process is intended to select an impartial jury by eliminating prospective jurors who may harbor a bias or prejudice with respect to the particular defendant, the charges at issue in the case, or the witnesses in the case; who may be unwilling to follow the court's instructions on the law governing the case; or who should be excused from service on the particular case for some legitimate reason. *See Collins v. State*, 452 Md. 614, 623-24 (2017); *Charles v. State*, 414 Md. 726, 733 (2010).

Jury selection can be thought of as a two-stage process: an initial stage directed to challenges for cause and a second stage at which parties exercise peremptory strikes.

---

[1] Terms such as "jury pool," "jury panel," "venire," "prospective juror," and "qualified juror" are sometimes used interchangeably in certain contexts to mean the same group or individuals and are sometimes used in other contexts to mean different subsets of groups or individuals. We shall do our best to make clear and to be consistent in our use of those terms in this opinion.

*First Stage –* Voir Dire *Questions and Challenges for Cause*

The first stage involves questioning of prospective jurors as a group, sometimes with follow-up questioning of individual jurors at the bench. Maryland Rule 4-312(e). This is often referred to as *voir dire*, and the questions asked are referred to as *voir dire* questions. A prospective juror's answers to *voir dire* questions may result in the trial judge excusing that individual "for cause" – an assessment that the individual, for one reason or another, might not be able to discharge the juror's obligation to decide a case fairly and impartially for the duration of the trial. CJ §8-404(b)(2)(ii).

During the past decade, a special committee of the Maryland State Bar Association ("MSBA") developed and published model *voir dire* questions for both criminal and civil trials. MSBA Special Committee on *Voir Dire*, *Model Jury Selection Questions* (2018). The product of those efforts has been endorsed by this Court in a published opinion. *Collins*, 452 Md. at 628-32.

This Court has frequently emphasized that, unlike courts in many other jurisdictions, Maryland courts allow only "limited *voir dire*" – meaning that the sole purpose of *voir dire* questioning is to determine whether prospective jurors should be struck for cause, not to elicit information for the exercise of peremptory strikes in the second stage of jury selection. *E.g.*, *Kazadi v. State*, 467 Md. 1, 46-47 (2020); *Collins v. State*, 463 Md. 372, 404 (2019); *Pearson v. State*, 437 Md. 350, 356-57 (2014); *Washington v. State*, 425 Md. 306, 312 (2012).

The trial judge must ensure that enough panel members will remain after prospective jurors are excused for cause during the first stage of jury selection to provide

5

the necessary number of jurors and alternates, taking into account the number of peremptory strikes that each party can exercise at the second stage of jury selection. Maryland Rule 4-312(f).

*Second Stage – Peremptory Strikes*

The second part of the jury selection process involves the seating of a jury from the members of the jury panel who remain after challenges for cause have been decided. During this stage the parties may eliminate some potential jurors from service on the jury by exercising their "peremptory challenges," also called "peremptory strikes."[2] CJ §8-404(b)(2)(i).

Each party is allotted a specific number of peremptory strikes,[3] which the party may exercise at its discretion for a good reason or on a whim, but not for a prohibited

---

[2] Whether peremptory strikes ensure, or detract from, the impartiality of a jury is an open question. Some jurisdictions (including England, the origin of the peremptory strike) have eliminated peremptory strikes in jury selection. Some American Supreme Court justices have suggested that they should also be abolished in this country. *See Batson v. Kentucky*, 476 U.S. 79, 105-08 (1986) (Marshall, J., concurring); *Miller-El v. Dretke*, 545 U.S. 231, 266-73 (2005) (Breyer, J., concurring); *see also* Morris B. Hoffman, *Peremptory Challenges Should be Abolished: A Trial Judge's Perspective*, 64 U. Chi. L. Rev. 809 (1997).

[3] Generally, the Maryland Rules allot each party four peremptory strikes with respect to the selection of the 12 jurors in a criminal trial. Maryland Rule 4-313(a)(1). Additional peremptory strikes are provided if the potential sentence upon conviction could exceed 20 years imprisonment. Maryland Rule 4-313(a)(2)-(3); *see also* CJ §8-420. For each alternate juror to be selected, the State has the same number of peremptory strikes as the number of defendants – *e.g.*, if there are two defendants, the State has two peremptory strikes as to each alternate juror to be selected. Each defendant has two peremptory strikes as to each alternate juror to be selected. Maryland Rule 4-313(a)(4).

discriminatory purpose.[4]  This stage of the process is conducted by considering prospective jurors one by one in the order designated by the trial judge.  The parties take turns either accepting the particular juror for service on the jury or exercising a peremptory strike. Maryland Rules 4-312(g) (prospective jurors to be called from list in order designated by trial judge), 4-313(b) (alternation of strikes).  Prospective jurors deemed "acceptable" by both sides may be seated in the jury box.  However, even though a party has deemed a prospective juror acceptable, the party may be permitted to strike that juror "from the box" later if the party still has peremptory strikes available.  This second stage of jury selection ordinarily does not involve further questioning of prospective jurors.

At this stage, a trial judge has discretion to call prospective jurors for consideration in whatever order the judge has determined is appropriate.  Maryland Rule 4-312(f)-(g). Often, judges simply call the prospective jurors by reference to a range of numbers that starts with the juror with the lowest number.  However, nothing in the rules or statutes governing jury selection requires the trial judge to start at any particular place in the jury list.

## II

### Background

The issues in this appeal relate solely to selection of the jury.  For context, we briefly sketch the facts of the case and the prosecution that resulted.  We then focus on the manner

---

[4] *See Batson v. Kentucky*, 476 U.S. 79 (1986).

in which the jury was selected for Mr. Kidder's trial. Finally, we describe the course of Mr. Kidder's appeal.

## A.        *The Incident and the Prosecution*

*Mr. Kidder Drives Drunk, Strikes and Kills a Cyclist, Then Crashes into a Car*

The evidence introduced at trial, viewed in the light most favorable to the jury's verdict, established the following facts.

On May 6, 2018, at around 10:00 p.m., Mr. Kidder was driving his sport utility vehicle on Racetrack Road in Berlin, Maryland when he struck Jose Madrid Pineda, who was riding a bicycle home from work that night.[5] A neighbor who heard a "boom" came outside, saw Mr. Madrid and his bicycle on the ground, and called 911. Mr. Madrid was later found in a nearby ditch. He died of his injuries.

Mr. Kidder did not stop after striking Mr. Madrid. Rather, he continued driving. A short distance away, another driver, Devon Alexander, had stopped at a traffic light and was waiting to turn left into the parking lot of a convenience store. Mr. Kidder crashed into Mr. Alexander's car. After the collision, Mr. Alexander got out of his car to check on Mr. Kidder. Both drivers then moved their vehicles out of the traffic lanes.

Mr. Alexander observed that Mr. Kidder smelled strongly of alcohol, was slurring his speech, had red eyes, and stumbled when he stepped out of his sport utility vehicle. Mr.

---

[5] The victim, an immigrant from Honduras, is referred to in some places in the record as "Mr. Pineda" and in other places as "Mr. Madrid." In accordance with the naming customs of Spanish-speaking countries and the references to him by his family members, we will refer to him by the latter name.

Kidder told Mr. Alexander that he had not seen Mr. Alexander's car. He told Mr. Alexander that he had been drinking, that he did not have insurance, and that he was not having a good day.

Mr. Alexander's aunt and cousin, who lived nearby, came to the scene of the collision and also observed that Mr. Kidder smelled of alcohol and seemed impaired. A call was made to 911 and Mr. Alexander advised Mr. Kidder to remain at the scene of the crash. After pacing back and forth for a while, Mr. Kidder left on foot before the police arrived.

*Charges, Trial, and Sentencing*

A warrant was issued for Mr. Kidder's arrest, and police apprehended him at his home.

Mr. Kidder was charged in a criminal information in the Circuit Court for Worcester County with: (1) negligent homicide by motor vehicle while under the influence of alcohol, in violation of Maryland Code, Criminal Law Article ("CR"), §2-503; (2) negligent homicide by motor vehicle while impaired by alcohol, in violation of CR §2-504; (3) failure to remain at the scene of an accident involving death, in violation of Maryland Code, Transportation Article ("TR"), §20-102(b)(1); (4) negligent driving, in violation of TR §21-901.1(b); (5) driving while under the influence of alcohol, in violation of TR §21-902(a)(1)(i); and (6) driving while impaired by alcohol, in violation of TR §21-902(b)(1)(i).

During a two-day trial in November 2018, the State presented testimony of Mr. Alexander, Mr. Alexander's aunt and cousin, the neighbor who heard the first collision

involving Mr. Madrid and saw its aftermath, a DNA analyst who matched blood on Mr. Kidder's SUV to Mr. Madrid, an assistant medical examiner who explained how the injuries suffered by Mr. Madrid in the collision resulted in his death, and State Police troopers who investigated the incident. The State also introduced photos of both crash sites, and a surveillance video from a nearby business that captured part of the collision of Mr. Kidder's SUV with Mr. Madrid. The defense did not call any witnesses, and Mr. Kidder elected not to testify.

At the conclusion of the trial, the jury found Mr. Kidder guilty on all six counts. On January 28, 2019, Mr. Kidder was sentenced to an aggregate sentence of 20 years imprisonment with all but 10 years suspended, to be followed by five years of supervised probation, and a fine of $1,000.

**B.**     ***Jury Selection at Mr. Kidder's Trial***

The Circuit Court had summoned 60 prospective jurors from the county jury pool for Mr. Kidder's trial. At the outset of the trial, the trial judge explained to counsel how he planned to conduct jury selection:

> [T]he process that the Court intends to follow is a process that actually is obtained and referenced in [a] model jury selection question manual put together by the Maryland State Bar Association Special Committee on *Voir Dire* 2015 through 2016 report. In that publication it references methods – this is the last page, page 91, where it says methods commonly used in Maryland for jury selection.
>
> And it is No. 4 as the commonly used method in Maryland for jury selection albeit commonly used might be a term of art because, at least

10

according to this publication, there are just a few Circuit Court judges who utilize this method.[6]

But I note that it is not … pursuant to the publication, it is not a disapproved method as is method No. 3 which actually has a highlight that says method disapproved in *Wright v. State*, 411 Md. 503, 2009, and it cites two other cases.[7]

_____

[6] It is evident from the description and page number cited by the trial judge that he was referring to judicial education handout materials from a program conducted by the Judicial College of Maryland in October 2016. Those materials include an early version of the MSBA special committee's report on *voir dire* questions for criminal trials, which appears on pp. 72-90 of the materials. The report itself does not list options for jury selection methods. However, immediately following the MSBA committee's report in the judicial education handout materials is a single page (numbered p. 91) entitled "Methods Commonly Used in Maryland for Jury Selection." Option 4 on that list corresponds to the jury selection method used by the judge in this case. It reads as follows:

> 4. Judge reads all the questions to the panel as a group. Responses are noted. If there are a sufficient number of jurors who did not respond to any question which would allow the jury to be picked then the responders are dismissed without being questioned and the jury is picked only from among the non-responders without any further questioning. This method is used by only a few judges in Baltimore City.

It is thus evident that the trial judge mistakenly associated that single-page list with the MSBA committee report that preceded it in the judicial education materials. Materials provided during Judicial College programs are typically not publicly available under Maryland Rule 16-913(e), but the relevant portion of this particular handout may be accessed at the following link: https://perma.cc/HRX4-XJE3. The same list of jury selection methods referenced by the trial judge had also appeared in a 2009 article in The Maryland Daily Record. *See* Dennis M. Sweeney, *Sweeney: What is the Wright Way to Question Potential Jurors?*, The Daily Record (Dec. 28, 2009), available at https://perma.cc/EK8R-NM2H.

In any event, while the trial judge's attribution of the source of this method of jury selection may not have been precisely accurate, it is true that it was a recognized method of selection used by at least some other judges.

[7] The jury selection method disapproved in the *Wright* case involved asking all prospective jurors collectively 17 *voir dire* questions in a row without obtaining or recording any responses from the jury panel, and then questioning each juror individually as to whether the individual had a response to any of the 17 questions, thereby effectively requiring each prospective juror to remember the questions and any responses for the

The trial judge then did some math to calculate the total number of prospective jurors needed for the second stage of jury selection to seat a jury, following the elimination of any prospective jurors who were struck for cause. In particular, the judge planned to seat 12 jurors and one alternate – *i.e.*, 13 jurors were needed for the trial. If each party exercised all of their peremptory strikes, an additional 11 prospective jurors would be needed to allow for those strikes.[8] Thus, once any challenges for cause had been resolved, a total of 24 prospective jurors would be needed to select the jury.

The trial judge then elaborated on the method he would use to select the requisite 24 prospective jurors. The method he chose was seemingly more efficient because it focused the selection process on prospective jurors unlikely to be excused for cause. The trial judge explained:

> What the Court's intention to do regarding the *voir dire* process is to ask all of the questions in their entirety noting any affirmative or negative responses on the jury list by the juror number. And since the questions are enumerated, it's actually a pretty easy process to follow.
>
> Once all of the questions have been propounded to the venire panel, the Court will then determine using – with the assistance of the clerk – will determine if there are 24 individuals who have not answered affirmatively or negatively to any question.

---

duration of the selection process. The list of jury selection options in the judicial education materials that the trial judge was apparently referencing noted (at p. 91) that the method used in *Wright* had been disapproved, citing that case and two others, as the trial judge indicated.

[8] Each side could exercise four peremptory strikes as to the jurors; the defense had two strikes as to the alternate juror, and the State had one strike as to the alternate juror – an aggregate total of 11 peremptory strikes.

> If they have not answered affirmatively or negatively, there would be no reason to bring them up to the bench for additional questioning.
>
> If that number is 24 – if there are 24 such individuals, then we can immediately go to alternating strikes to the selection process.

Defense counsel objected to the method, arguing both that it "would prohibit individuals [from serving on the jury] for benign reasons who would otherwise have no issues sitting in judgment of a case like this," like "having a relative in law enforcement or having a strong feeling about a particular crime," and that it would "be tantamount to the Court exercising *sua sponte* cause challenges without inquiring as to whether an individual would be unable to sit fairly and impartially in this case."

The trial judge responded to the objection, explaining that this method did not involve striking any prospective juror simply because the individual responded to a *voir dire* question:

> [T]he record is very clear, in the event that 24 people – there are not 24, but let's say only 20 people who have not answered any question, then we would examine jurors until we had the number 24. So my proposed method in no way is an absolute bar to the possibility of further examination of the venire panel or individual potential jurors.
>
> It also needs to be absolutely clear that the Court by following this process, I'm not determining, not even remotely close to determining, that people who have answered affirmatively or negatively to any question that they are not qualified jurors, and that they should therefore be stricken for cause.

The judge explained that he believed that the initial sorting of prospective jurors under this method was not a determination whether the individuals were "qualified versus unqualified," but simply a means to "move this case along."

And so it must be clear that I am not determining qualified versus unqualified. This is simply a method that gives all parties an assurance that the person who is coming forward to be selected as a juror doesn't have a potential bias because even when we examine individuals further about an affirmative response to a question, then there can sometimes be objections to whether or not or motions to strike for cause that the Court overrules. And so I'm not determining that these individuals are unqualified. It's simply a process that for – it moves this case along.

Finally, the judge indicated that he believed that the method had been "approved" as part of the MSBA model jury selection question manual.[9]

As further detailed in the Appendix attached to this opinion, the trial judge then posed 18 *voir dire* questions to the venire. Appendix at pp. 1-4. After he asked a question, those panel members who had an affirmative answer to the question stood, and the judge took note of their juror numbers. Nine of the 18 questions elicited affirmative responses from at least one juror. Of the 60 members of the venire, 46 prospective jurors responded to one or more of the questions; the remaining 14 prospective jurors did not respond to any of the questions. Thus, under the method of jury selection chosen by the trial judge, those 14 prospective jurors were advanced to the second stage of jury selection at which the parties would exercise peremptory strikes.

To obtain the requisite 24 jurors needed for the second stage of jury selection, the trial judge then proceeded to conduct individual questioning at the bench of prospective

---

[9] As indicated in footnote 6 above, the MSBA special committee had not endorsed the method, but the method had been widely circulated on a list of methods actually used by other Maryland trial judges. The list of jury selection methods that the trial judge referred to thus might be more accurately characterized as a descriptive list of the methods that *had been used*, as opposed to a normative list of methods that *should be used* (although it did indicate that the method used in *Wright* had been "disapproved").

14

jurors who had indicated an affirmative response to one or more of the *voir dire* questions. Appendix at p. 5. The judge called those jurors to the bench one-by-one for individual questioning, in numerical order starting with the lowest juror number. Some of those prospective jurors were excused for cause as a result of that questioning,[10] but 10 survived the additional questioning without being excused for cause, and the court had the necessary 24 prospective jurors.[11] *Id.*

The court then proceeded to the second stage of jury selection. Proceeding by numerical order, the trial judge began to call each of those 24 prospective jurors for consideration by the parties. The State and the defense took turns either declaring a prospective juror "acceptable" or exercising a peremptory strike against that individual. Of the first 11 prospective jurors considered in this manner, 10 had indicated a response to *voir dire* questions and had been individually questioned. When it was the turn of one panel member who had not indicated a response to any of the *voir dire* questions, there was a brief exchange between the judge and the prospective juror during which the latter advised the trial judge that "I was asleep." The parties exercised peremptory strikes against five prospective jurors who had responded to *voir dire* questions and three prospective

---

[10] Jurors who were excused for cause indicated prior convictions for drunk driving, personal familiarity with the homicide victim or witnesses, a moral belief in not judging others, or a bias in favor of police testimony.

[11] As it later turned out, only 21 prospective jurors were ultimately needed in the second stage of jury selection, as the parties did not exercise any of their aggregate three strikes with respect to the alternate juror.

jurors who had not. Appendix at p. 6. In the end, the jury was composed of five jurors who had responded to *voir dire* questions and seven who had not.[12] Appendix at p. 7.

At the conclusion of jury selection, both the State and the defense indicated that they were satisfied with the jury.[13] The clerk then swore in the 12 jurors and one alternate.

## C. *Appeal*

Mr. Kidder appealed his convictions, raising a number of issues. Among those issues was a contention that the jury selection method employed by the trial judge "excluded significant parts of the community from the jury in violation of his right to a fair and impartial jury."

In an unreported decision, the Court of Special Appeals affirmed the verdict but remanded for resentencing on one count.[14] *Kidder v. State*, 2020 WL 6260088 (Oct. 23, 2020). The intermediate appellate court rejected Mr. Kidder's argument concerning jury selection. However, citing its recent decision in *Williams v. State*, 246 Md. App. 308

---

[12] If no peremptory strikes had been exercised, 10 of the members of the jury (including the alternate) would have been panel members who responded to *voir dire* questions, were then questioned individually, and were not struck for cause.

[13] Defense counsel, stating that he did not want to waive his objections to the method of jury selection, qualified that his statement that the jury was "acceptable" was subject to his previous objections. This reference to previous objections avoided any argument that the defense waived those objections. *See State v. Ablonczy*, ___ Md. ___, 2021 WL 2562312 (2021).

[14] The intermediate appellate court vacated the sentence on the charge of failing to stop at the scene of an accident involving death because the State had failed to provide Mr. Kidder requisite notice for an enhanced sentence for that offense. It remanded the case for the Circuit Court to re-sentence Mr. Kidder on that count. *Kidder*, 2020 WL 6260088 at *12.

(2020), which involved a challenge to the same method of jury selection, the court stated that this method, while "not impermissible," was "ill-advised." *Kidder*, 2020 WL 6260088 at *7.[15]

Mr. Kidder filed a petition for a writ of *certiorari*, which we granted.

### III

### Discussion

Mr. Kidder presents two arguments why the method of jury selection at his trial should result in reversal of his convictions. First, he argues that the method "violated [his] right to a trial by a jury drawn from a fair cross-section of the community as guaranteed by Article 21 of the Maryland Declaration of Rights."[16] Second, he argues that, in using this method, the trial judge impermissibly struck individuals from his jury in violation of CJ §8-404(b).

### A.    *Standard of Review*

Trial courts have broad discretion in how jury selection is conducted, including the form and substance of *voir dire* questions. *Wright v. State*, 411 Md. 503, 508 (2009); *Dingle v. State*, 361 Md. 1, 13-14 (2000). An appellate court reviews how a trial judge conducts jury selection under an abuse of discretion standard. *Wright,* 411 Md. at 507-08.

---

[15] The same trial judge presided at the trials of both this case and the *Williams* case, which occurred some months after the trial of Mr. Kidder's case. The appeals in the two cases were argued on the same day (April 8, 2020) before the same panel of the Court of Special Appeals.

[16] Petitioner's Brief at 7.

17

Of course, it would be an abuse of discretion for a trial court to use a method of jury selection that violated a defendant's right to an impartial jury. A party claiming denial of the right to an impartial jury bears the burden of proving that the jury selected was not impartial. *Bristow v. State*, 242 Md. 283, 286 (1966).

**B.** ***Whether the Jury Selection Method Violated the Right to an Impartial Jury***

Mr. Kidder does not directly attack the impartiality of the jury at his trial. That decision seems prudent as nothing in the record suggests that any of the jurors who actually sat on his case were biased in any respect as to him or the charges against him. Instead, he asserts that the jury selection method used by the trial judge violated the requirement that the jury be drawn from a fair cross-section of the community.

This Court first addressed the fair cross-section requirement in *Wilkins v. State*, 270 Md. 62, 65 (1973).[17] Quoting cases construing the constitutional right and citing the Maryland statute that implements that right – at that time, codified at Maryland Code, Article 51, §1 *et seq*.[18] – the Court stated that the "[t]he American tradition … necessarily contemplates an impartial jury drawn from a cross-section of the community." *Id*. (citation and internal quotation marks omitted). As the Court noted, the requirement that a jury panel be drawn from a fair cross-section of the community "does not mean, of course, that every jury must contain representatives of all social, religious, racial, political and

---

[17] In *Wilkins,* this Court adopted the opinion of the Court of Special Appeals "with minor editing." 270 Md. at 63.

[18] We shall return to Article 51, §1 *et seq*. in a later section of this opinion.

geographical groups of the community …. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups." *Id.* Thus, the focus of an inquiry concerning the selection of a jury is not whether the jury itself is a representative cross-section of the community, but whether the selection of jurors "produced a systematic or intentional exclusion of any cognizable group or class of qualified citizens." *Id.* at 66[19] (citation and internal quotation marks omitted).

---

[19] That is the test that the Court of Special Appeals applied to assess this method of jury selection in its decisions in *Williams* and in this case. *Williams*, 246 Md. App. at 344-45; *Kidder*, 2020 WL 6260088 at *8.

The same or a similar test has been applied in many other jurisdictions when a defendant has challenged the composition of a grand or trial jury for failure to meet a fair cross-section requirement. Many of those cases used the concept of "cognizable group" in applying the Supreme Court decision in *Duren v. Missouri*, 439 U.S. 357 (1979), which held that the fair cross-section requirement of the Sixth Amendment was violated when a "distinctive group" is under-represented in the jury selection process due to a systematic exclusion of that group. *See, e.g.*, *Rayburn v. State*, 495 So.2d 733 (Ala. Crim. App. 1986) (county residents with out-of-county zip code were not cognizable group); *Barber v. Ponte*, 772 F.2d 982 (1st Cir. 1985) (discussing whether young adults are a cognizable group); *Willis v. Zant*, 720 F.2d 1212, 1215-17 (11th Cir. 1983) (same); *State v. Williams*, 659 S.W.2d 778, 780 (Mo. 1983) (en banc) (discussing whether attorneys are a cognizable group); *State v. Haskins*, 450 A.2d 828, 834-36 (Conn. 1982) (considering 10 different groups proffered by defendant as cognizable groups); *State v. Nelson*, 603 S.W.2d 158, 163-64 (Tenn. Crim. App. 1980) (members of religious commune that constituted more than 10% of county population were cognizable group); *State v. Acosta*, 608 P.2d 83, 87 (Ariz. App. 1980) (Mexican-Americans were cognizable group, but people aged 18-24 were not); *State v. Foster*, 242 N.W.2d 876, 880-81 (Neb. 1976) (19 and 20 year old voters were not a cognizable group); *State v. Taylor*, 303 So.2d 169, 170-71 (La. 1974) (same); *see also People v. Estrada*, 93 Cal. App. 3d 76, 86-96 (Cal. App. 1979) (considering claim that various categories of people should be considered cognizable groups); *United States v. Black Bear*, 878 F.2d 213, 214-15 (8th Cir. 1989) (Native Americans were a cognizable group).

To apply this test, we consider: (1) whether the method of jury selection systematically or intentionally excluded certain prospective jurors; and (2) if so, whether those excluded constitute a "cognizable group." Mr. Kidder bears the burden of establishing both propositions. As explained in more detail below, the record of this case does not bear out either proposition.

1.      Whether Any Prospective Jurors Were Excluded from the Jury

Referring to some members of the jury venire who were not considered at the peremptory challenge stage of jury selection, Mr. Kidder argues that the jury selection method used by the trial judge "skipped over" certain prospective jurors.[20] He asserts that this resulted in the exclusion of those individuals from the jury.

The selection method used by the trial judge is characterized more accurately as a re-ordering of the jury panel for purposes of the second stage of jury selection than as an "exclusion" of any particular juror. Of the panel members who had responded to *voir dire* questions, some might have been excused for cause and would never have made it to the second stage of jury selection.[21] As to the others, it was also inevitable that many (if not

_____

[20] Mr. Kidder asserts that 19 prospective jurors with juror numbers 314 or greater were "skipped over." However, even if the trial judge had proceeded in strict numerical order, as Mr. Kidder apparently would prefer, most of those prospective jurors would not have been considered for his jury because they would not have been reached. Ten jurors with juror numbers lower than 314 were initially seated on the jury. Appendix at p. 6. Even after some of those jurors had been struck from the box by the parties, only five additional jurors with numbers greater than 314 were seated on the jury.

[21] It is notable that this method of jury selection did not suffer from the problem identified by this Court in *Wright* – forcing panel members to remember the questions and their answers for the duration of the first stage of the jury selection process. Instead, the trial judge in this case followed the manner of questioning endorsed by this Court in

20

most) of those prospective jurors would not be excused for cause after individual questioning, but still would never be reached in the selection process, because 60 prospective jurors had been summoned and only 24, at the most, were needed for the final stage of the jury selection. From a trial judge's perspective, it would certainly seem more efficient to re-order the panel in a way that focused on prospective jurors who never would be excused for cause – as they did not respond to any of the questions designed to ferret out such cause – before spending the time and effort to consider and resolve whether there was good cause to excuse every panel member who *did* respond to *voir dire* questions when most of them would never be reached for the final stage.

As indicated earlier, a trial judge has discretion under the Maryland Rules to reorder a jury panel. *See* Maryland Rule 4-312(f) ("Before the exercise of peremptory challenges … [t]he judge *shall ... prescribe the order to be followed* in selecting individuals from the list") (emphasis added); 4-312(g)(1) ("The individuals to be impaneled as sworn jurors, including any alternates, shall be called from the qualified jurors remaining in the order previously *designated by the trial judge* and shall be sworn.") (emphasis added). Thus, there is no requirement that a jury be selected from a panel in any particular order. *See, e.g.*, *Adams v. State*, 183 Md. App. 188 (2008), *rev'd on other grounds*, 415 Md. 585 (2010) (rejecting challenge to trial judge's decision to select jurors beginning with seventh member of panel). And, of course, a defendant does not have a right to have any particular

---

*Wright*: asking the *voir dire* questions of the panel generally, soliciting an indication as to which members of the panel had a response after each question was read, noting the number of each such panel member, and then, during individual questioning, asking what prompted that individual's responses to particular questions. *See Wright*, 411 Md. at 514.

panel member seated on the jury. *Tichnell v. State*, 287 Md. 695, 714 (1980) (under Article 21, "an accused does not have the right to be tried by any particular jury or jurors").

Mr. Kidder argues that the trial judge's re-ordering of the jury panel in this manner "constructively excluded" some of the jurors who indicated a response to a *voir dire* question. That argument overlooks the facts that 14 prospective jurors who had responded to the trial court's initial *voir dire* questions were, in fact, subject to further questioning, that 10 of those prospective jurors advanced to the peremptory strike stage, and that five of them eventually were seated on Mr. Kidder's jury. Appendix at pp. 5-7.

Any method of jury selection would have entailed only 24 members of the 60-member panel – at the most – being considered at the second stage of jury selection (for the exercise of peremptory strikes). That means that 36 members of the panel would not be involved in the second stage of jury selection. Under Mr. Kidder's theory, any of those 36 prospective jurors who had not been excused for cause would have been "excluded" from his jury.[22] However, those prospective jurors were not "excluded" from the jury; they simply were not reached. As anyone who has participated in team sports knows, there is a difference between being cut from the team and being designated third-string goalie but not taking the field in a particular game because the team never needed to call upon more than the first and second strings for that game.

---

[22] Similarly, if 100 prospective jurors had been summoned for the case, up to 76 prospective jurors (100 minus 24) would have been "excluded" under Mr. Kidder's theory.

2.      Whether any "Cognizable" Groups Were Excluded

Assuming for the sake of argument that panel members who did not advance to the second stage of jury selection were "excluded" from the jury, the next question is whether they constitute a "cognizable" group.

In *Wilkins*, this Court adopted the criteria applied in federal case law to distinguish a cognizable group for purposes of the right to an impartial jury:

● **Defining and limiting factor**.  "A cognizable group is not one whose membership shifts from day to day or whose members can be arbitrarily selected."

● **Cohesion**.  "There must be a common thread which runs through the group, a basic similarity in attitudes or ideas or experience which is present in members of the group and which cannot be adequately represented if the group is excluded from the jury selection process."

● **Exclusion may result in bias**.  "[T]here must be a possibility that exclusion of the group will result in partiality or bias on the part of juries hearing cases in which group members are involved.  That is, the group must have a community of interest which cannot be adequately protected by the rest of the populace."

*See* 270 Md. at 67 (quoting *United States v. Guzman*, 337 F. Supp. 140, 143-44 (1972)).[23]

---

[23] Mr. Kidder asserts that *Wilkins* involved an application of only the federal Constitution – *i.e*., the Sixth Amendment – and suggests, in general terms, that Article 21 of the Maryland Declaration of Rights is more demanding.  However, *Wilkins* did not explicitly cite either constitutional provision, and there is no suggestion in that case – or any other of this Court – that the right to an impartial jury under the federal Constitution differs from the same right under the State Constitution.  The wording of the two constitutional provisions is virtually identical.  *Compare* Maryland Declaration of Rights, Article 21 ("[I]n all criminal prosecutions, every man hath a right … to a speedy trial by an impartial jury") *with* United States Constitution, Sixth Amendment ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury").  Mr. Kidder provides no reasoned justification for construing them differently.

23

In *Wilkins*, the defendant argued that the use of voter registration lists to populate the jury pool from which the venire was drawn had the effect of excluding a cognizable group – which he characterized as people who were qualified to vote, but not registered as voters. *Wilkins*, 270 Md. at 66. The Court disagreed, on the basis that those who failed to register to vote (1) varied from election to election, and (2) had no common interest apart from "their failure to exercise their right of franchise at a given election." *Id*. at 68 (quoting *United States v. Greenberg*, 200 F. Supp. 382, 391 (S.D.N.Y. 1961)). Moreover, use of voter registration lists ensured that the jury pool would include truly cognizable groups defined by characteristics such as "race, sex, religion, national origin, or wealth." *Id*. at 68-69 (quoting *United States v. Van Allen*, 208 F. Supp. 331, 335-36 (S.D.N.Y 1962)).

By contrast, in *King v. State*, 287 Md. 530 (1980), the Court held that a significant segment of society had been excluded as a result of a trial judge's decisions to excuse some prospective jurors for cause. In *King*, the defendant was charged with possession with intent to distribute marijuana. During jury selection, the trial judge asked if anyone in the venire felt that the law was wrong in prohibiting the use and possession of marijuana. 287 Md. at 532-34. Two prospective jurors indicated affirmative answers and, after further questions about the nature of their respective beliefs, the trial judge, over a defense objection, excused both of them for cause without any inquiry as to whether those views would affect their ability to decide the case fairly and impartially.

On appeal, this Court reversed the defendant's conviction and remanded the case for a new trial. The Court noted that a "significant segment of our society believes … that the criminal laws relating to marijuana should be modified." 287 Md. at 536. The Court

24

considered whether the trial judge's action excusing the two jurors for cause represented a "systematic exclusion." *Id.* at 538. The Court held that it was reversible error to exclude a "significant part of the community" – *i.e.*, "the entire class of prospective jurors" who shared that belief – without inquiring as to whether individual members of that class could be impartial. *Id.* at 539.

Mr. Kidder analogizes this case to *King*. But *King* is inapposite for at least three reasons. First, in *King*, the two prospective jurors were excused as a result of their responses to a *voir dire* question and a few follow-up questions without any inquiry into their ability to serve fairly and impartially. By contrast, none of the prospective jurors at Mr. Kidder's trial was excused simply because the prospective juror had indicated a response to an initial *voir dire* question; all who indicated that they had a response to one or more questions remained eligible to be seated on the jury. In the end, 14 of those prospective jurors were questioned at some length individually, 10 advanced to the peremptory strike stage of jury selection, and five ultimately served on the jury.

Second, the prospective jurors excluded in *King* were linked by a common belief, and in that belief represented, as this Court noted, a significant part of the community. Mr. Kidder suggests that similar groups were excluded from his jury simply because they indicated they had an answer to one of the 18 *voir dire* questions: those who "watch the news, have strong feelings about crime, have ever been arrested, are members of law enforcement, are related to members of law enforcement, have ever been the victim of, or even witnessed a crime, or know prosecutors, defense attorneys, potential witnesses, victims, or defendants." However, he offers no analysis of how the respondents to these

25

questions could be deemed to form any cognizable group. It seems implausible, for example, that those who watch the news necessarily share similar attitudes, ideas, or experiences. It is similarly difficult to imagine that people with strong feelings about drunk driving or negligent homicide are a cognizable group.

Third, and perhaps most importantly, no member of the panel indicated a response to the question whether they had "strong feelings" about the crimes charged (or to eight other *voir dire* questions, for that matter). Thus, in Mr. Kidder's case and in contrast to *King*, no cognizable group was defined by that question.

*Williams* is illustrative of the distinction between this case and *King*. There, the Court of Special Appeals assessed the same jury selection method as used in Mr. Kidder's trial and considered whether prospective jurors who responded to particular *voir dire* questions, but were not questioned individually or considered at the later stage of jury selection, constituted cognizable groups. *Williams*, 246 Md. App. at 345-46. The intermediate appellate court concluded that there was no "common thread" of similarity in attitudes, ideas, or experiences among the prospective jurors who were not selected for the jury. *Id.* at 346. In Mr. Kidder's case, too, no common thread is apparent.

In any event, the selection method used by the trial judge in this case did not treat those who responded to a particular *voir dire* question as a discrete group, cognizable or otherwise. Substantial portions of the respondents to those questions that elicited more than a few responses advanced to the second stage of jury selection, and several served on the jury. For example, of the 14 members of the panel who indicated they knew one of the

26

witnesses, seven were questioned individually, two were excused for cause, two were the subject of peremptory strikes, and three served on the jury. *See* Appendix at pp. 2, 5-7.

3. Summary

The jury selection method used by the trial judge in this case did not "exclude" from the jury any members of the venire panel other than those who were excused for cause or were subject to peremptory strikes. As in virtually every case in which a jury is selected, some members of the panel were ultimately not reached as a result of the order in which prospective jurors were considered in the two stages of jury selection. But that does not mean that those prospective jurors were "excluded" from the jury. In any event, the record in this case does not establish an exclusion of any "cognizable group" from Mr. Kidder's jury.

The method of jury selection used in this case may be efficient, as it gives priority to those prospective jurors who clearly will not be struck for cause. But it is likely not the best method for achieving the kind of jury we seek. One may indulge the presumption that prospective jurors answer questions honestly, but still be concerned that even honest and unbiased jurors may be inattentive or distracted in the unfamiliar setting of jury selection. This method of jury selection may unwittingly give priority to some prospective jurors who failed to respond to the initial *voir dire* questions because they were inattentive. Inattention is not a desirable characteristic in a juror, even if the juror is unbiased.[24] Moreover, giving

---

[24] As noted earlier, one of the prospective jurors who had not indicated an answer to any *voir dire* question apologized to the trial judge that he had been sleeping during the peremptory challenge stage of selection.

27

certain prospective jurors a priority of any kind, however well intentioned, may be inconsistent with the use of randomness in jury selection that reinforces the representativeness and inclusiveness of juries. *See* American Bar Association, *Principles for Juries and Jury Trials* (2016 rev.), Principle 10. Accordingly, trial judges should refrain from using this method.

### *C.* *Whether the Jury Selection Method Violated CJ §8-404(b)*

Mr. Kidder argues that the members of the jury panel in his case who indicated that they had a response to a *voir dire* question, but who were not individually questioned by the trial judge and did not advance to the second stage of jury selection, were "constructively struck" in violation of CJ §8-404(b).[25] That subsection states:

> (b)    (1) Whenever more individuals than are needed to impanel a jury have been summoned, an individual may be excused but only in accordance with rule or other law.
>
> (2) An individual who is summoned for jury service may be struck from a particular jury only:
>
> (i) In accordance with rule or other law, by a party on peremptory challenge;
> (ii) For good cause shown, by a trial judge on a challenge by a party: or
> (iii) Subject to paragraph (3) of this subsection, by a trial judge who finds that:
>
> 1. The individual may be unable to render impartial jury service;

---

[25] Mr. Kidder did not base his objection to the jury selection method on CJ §8-404(b) in either the trial court or the Court of Special Appeals. It was raised for the first time in questioning by this Court in oral argument. It might be argued that this ground was not preserved for appeal. However, we requested, and received, supplemental briefing concerning this statute. As indicated in the text, the statute simply reflects the constitutional provisions, and accordingly we do not reject this argument for non-preservation.

2. The individual's service likely would disrupt the proceeding; or

3. The individual's service may threaten the secrecy of a proceeding or otherwise affect the integrity of the jury deliberations adversely.

(3) A trial judge may not strike an individual under paragraph (2)(iii)3 of this subsection, unless the judge states on the record:

(i) Each reason for the strike; and

(ii) A finding that the strike is warranted and not inconsistent with §§8-102(a) and (b) and 8-104 of this title.

(4) An individual struck under this subsection may serve on another jury for which the basis for the strike is irrelevant.

As noted in Part I.C of this opinion, this statute recognizes that prospective jurors may be properly struck from consideration for a particular jury for cause (and even specifies some types of cause) or by peremptory strike.

The legislative history of this statute is instructive on whether the statute creates a standard distinct from that set by the constitutional provisions. The predecessor of CJ §8-404(b) was enacted in 1969 as Maryland Code, Article 51, §9. Chapter 408, Laws of Maryland 1969. It is part of the law on which the *Wilkins* decision, discussed in Part III.B.1 of this opinion, was based. *See Wilkins*, 270 Md. at 63 ("In 1969, Maryland adopted a uniform and comprehensive statute governing the selection of jurors," citing Chapter 408). In that decision, the Court noted that the statute incorporated the constitutional right to an impartial jury drawn from a fair cross-section of the community.

In 1973, as part of code revision, Article 51 became part of the then-new Courts & Judicial Proceedings Article. In particular, Article 51, §9 was re-codified at that time as

29

CJ §8-210(a)-(c). Chapter 2, §1, First Spec. Sess., Laws of Maryland 1973. As is generally the case with code revision, the organization and style of the statute were modified with little or no change in substance. *See* William H. Adkins II, *Code Revision in Maryland: the Courts and Judicial Proceedings Article*, 34 Md. L. Rev. 1, 41 (1974) ("Chapter 408 has been transferred to the Courts Article virtually without change"). The Revisor's Note pointed out that a reference to "rules" as well as "laws" was added to the statutory reference to permissible peremptory challenges. Chapter 2, §1, First Spec. Sess., Laws of Maryland 1973, Revisor's Note, at pp. 275-76.

In 2006, in a bill requested by the Judiciary, the General Assembly undertook another revision and recodification of the statutes relating to juries. Chapter 372, Laws of Maryland 2006. As part of that revision, the pertinent provision of CJ §8-210 was re-codified as the current CJ §8-404(b). The committee notes reprinted in the session laws state that CJ §8-404(b) is "new language derived from" the prior codification. In particular, the new codification substituted the verb "strike" for the verbs "excuse," "disqualify," and "exclude" with respect to the action taken by a trial judge in removing a prospective juror for consideration for service on a particular jury. Chapter 372, Laws of Maryland 2006 at p. 1987. Nothing in the committee notes or the legislative history of the statute suggests that there was any intent to change the substance of the statute.

Thus, the same standard applies in assessing Mr. Kidder's argument under CJ §8-404(b) as applies in assessing his constitutional argument. We have already determined, in response to Mr. Kidder's constitutional claim, that no prospective juror was excluded from consideration for jury service other than those who were excused for cause or as a

result of a party's peremptory strike – both of which are permissible bases for a prospective juror to be "struck" under CJ §8-404(b). In addition, in *Wilkins*, this Court held that, unless excluded jurors were a cognizable class, there was no violation of a "constitutional or *statutory* right," alluding to the statute in which the predecessor of CJ §8-404(b) appeared. 270 Md. at 67 (emphasis added). Finally, our analysis of Mr. Kidder's constitutional argument was based in part on a trial judge's discretion under the Maryland Rules and the common law to designate the order in which prospective jurors are considered during jury selection. We note that CJ §8-106 broadly states that "[n]othing" in Title 8 – the title that governs jurors and jury selection and in which CJ §8-404(b) appears – "restricts the inherent authority of a trial judge with regard to jurors."

We thus hold that the jury selection method used by the trial judge did not violate CJ §8-404(b).

## IV

## Conclusion

For the reasons set forth above, we hold that the method of jury selection used by the trial judge did not violate Mr. Kidder's constitutional right to an impartial jury drawn from a fair cross-section of the community. Nor did it violate CJ §8-404(b). Nevertheless, trial courts should refrain from using this method of jury selection as it uses a criterion for re-ordering the jury panel – silence in response to initial *voir dire* questions – that, though neutral on its face, may result in a jury that, though impartial, may not be as attentive and engaged as we want our juries to be.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.**

# Appendix

## I.       First Stage of Jury Selection

### A.       Voir Dire Questions

The jury panel consisted of 60 individuals who had been summoned for potential jury service at the trial. The trial judge asked the entire jury panel a series of 18 *voir dire* questions, which he had previously reviewed and discussed with counsel. After each question was asked, members of the panel were asked to stand if they had a response to the particular question. The judge noted the jury number of each prospective juror who stood and then, without further questioning of those jurors at that time, proceeded to ask the next *voir dire* question.

In total, 46 members of the panel indicated a response to one or more of the *voir dire* questions. Fourteen members of the panel did not indicate a response to any of the questions.

The 18 questions posed by the trial judge are listed below, along with the number of responses to each question (The juror numbers of those who responded to the question are listed in parentheses and italics in numerical order). Record Extract at 50-67.

1.       Do you know anything about this alleged incident, or have you seen or heard anything about it from any person or source including the Internet and news media?

      13 responses.[1]

*(176, 207, 227, 314, 336, 337, 343, 345, 367, 388, 401, 406, 418)*

2.       Are you related by blood or marriage to the defendant, or do you know the defendant from any business or social relationship?

      No responses.

---

[1] Twelve jurors responded to question 1 when asked. A thirteenth juror gave a belated response to question 1 after question 2 was asked.

3.      Do you know any of the counsel from any professional, business, or social relationship, or have you ever been represented in a legal matter by any of them?[2]

        4 responses.

        *(278, 300, 343, 378)*

4.      Do you know or are you familiar with Jose Eduardo Madrid Pineda through any contact or in any capacity?

        No responses.

5.      Do you know any of [the] witnesses in any capacity?

        14 responses.

        *(176, 207, 274, 283, 295, 300, 303, 327, 334, 346, 359, 375, 378, 406)*

6.      Would you give any greater or lesser credit or weight to the testimony of a police officer over that of a witness in another occupation merely because of his or her status as a police officer?

        9 responses.

        *(278, 283, 323, 336, 364, 374, 375, 388, 418)*

7.      Have any of you or any member of your immediate family – immediately family defined as spouse, parent, child, or spouse of a sibling – been (a) the victim of a crime similar to the crimes charged today; (b) a witness to a crime; (c) arrested for, charged with, or convicted of a crime other than a minor motor vehicle violation?

        23 responses.

        *(122, 176, 207, 273, 282, 283, 300, 307, 317, 323, 327, 330, 342, 356, 359, 368, 378, 393, 395, 400, 401, 406, 420)*

---

[2] Question 3 was asked in two parts, with the trial court asking prospective jurors who had responded to the first part to remain standing for the second part.

8.	Do any of you have strong feelings about the crimes with which the defendant is charged?

	No responses.

9.	Have you or any member of your immediate family – again defined as spouse, parent, child or spouse of a sibling – ever been a member of a law enforcement agency?

	17 responses.

	*(273, 278, 300, 303, 323, 327, 329, 337, 342, 348, 364, 374, 380, 383, 395, 401, 418)*

10.	Do you have a bias or prejudice either for or against the defendant?

	No responses.

11.	You must presume the defendant innocent of the charges now and throughout this trial unless and until after you have seen and heard all of the evidence and the State convinces you of the defendant's guilt beyond a reasonable doubt.  If you do not consider the defendant innocent now, or if you are not sure that you will require the State to convince you of the defendant's guilt beyond a reasonable doubt, please stand.

	No responses.

12.	Do you draw any inferences of guilt from the mere fact that a person has been charged with a crime?

	No responses.

13.	Is there any member of the panel who would be prejudiced against the defendant because of the defendant's race, color, religion, sexual orientation, appearance, or sex?

	No responses.

3

14. Do you have any urgent personal or business obligation that you cannot reschedule that could interfere with your ability to give your full attention to this trial?

    3 responses.

    *(283, 336, 343)*

15. Do you have any physical or mental ailments or problems such as hearing, sight, or otherwise which would render you incapable of performing your duty as a juror in this case if selected?

    2 responses.

    *(317, 346)*

16. Do you hold any moral, religious, or ethical conviction or belief that would prevent you from weighing the evidence and returning a fair and impartial verdict?

    1 response.

    *(279)*

17. Is there anything not yet mentioned that could affect your ability to make a fair and impartial judgment in this case and could affect your ability to base your judgment solely on the evidence presented in the courtroom or to follow the law as the Court will instruct you?

    No responses.

18. If you are selected as a juror in this case, will you render a fair and impartial verdict based upon the evidence presented in this courtroom and the law as it pertains to this particular case as instructed by the court?

    No responses.

4

B.     Individual Questioning and Challenges for Cause

The trial judge calculated that a maximum of 24 prospective jurors would be needed to select a jury of 12 plus one alternate, taking into account the number of peremptory strikes that the parties were entitled to exercise.

The trial judge noted that 14 of the prospective jurors had not responded to any of the *voir dire* questions (and thus would not be the subject of a challenge for cause).  He said that he would conduct individual questioning of the panel members who had indicated a response to one or more *voir dire* questions and entertain any challenges for cause as to those panel members in order to identify 10 additional prospective jurors for the next stage of jury selection.

Proceeding in numerical order from lowest juror number, the trial judge conducted individual questioning of prospective jurors who had indicated a response to one or more *voir dire* questions.  The trial judge asked for the individual's answers to those *voir dire* questions and then asked follow-up questions of his own or questions suggested by counsel. The trial judge then entertained, and ruled on, any challenge for cause as to the particular panel member.  Once 10 such panel members had completed the process without being struck for cause, the individual questioning of the venire members ceased.

The juror numbers of those questioned and the results of that questioning are listed below, in the order that they were questioned.  Record Extract at 67-132.

| | |
|---|---|
| 122 | excused for cause |
| 176 | qualified |
| 207 | excused for cause |
| 227 | qualified |
| 273 | qualified |
| 274 | qualified |
| 278 | qualified |
| 279 | excused for cause |
| 282 | qualified |
| 283 | excused for cause |
| 295 | qualified |
| 300 | qualified |
| 303 | qualified |
| 307 | qualified |

5

## II. Second Stage of Jury Selection

Exercise of Peremptory Strikes

The prospective jurors were then considered for peremptory strikes. Beginning in numerical order from the lowest number, each of the prospective jurors who had qualified for service on the jury stood and each party indicated whether it deemed the prospective juror "acceptable" or would exercise a peremptory strike. If both parties deemed the individual "acceptable," the prospective juror was seated in the jury box. As the process unfolded, the parties also had the opportunity to strike a juror from the jury box.

Below is a list of the qualified prospective jurors, by juror number, considered at this stage of the process and the results of the process. Because neither side exercised peremptory strikes as to the alternate juror and thus three peremptory strikes were not used, 21 panel members were considered. Prospective jurors who had responded to *voir dire* questions and had been questioned individually during the first stage of jury selection are indicated in bold face type. Record Extract at 132-38.

| | |
|---|---|
| **176** | struck by defense |
| **227** | struck by State |
| 260 | initially seated, but later struck from box by State |
| **273** | seated |
| **274** | seated |
| **278** | struck by defense |
| **282** | seated |
| **295** | seated |
| 296 | seated |
| 299 | seated |
| **300** | struck by defense |
| **303** | seated |
| **307** | initially seated, but later struck from box by State |
| 309 | initially seated, but later struck from box by State |
| 315 | seated |
| 316 | seated |
| 341 | seated |
| 353 | struck by defense |
| 362 | seated |
| 365 | seated |
| 371 | seated as alternate |

## III.    The Jury

The jurors who sat on the jury are listed below, by seat number and juror number. Jurors who responded to *voir dire* questions and were individually questioned are indicated in boldface type.

| Seat | Juror No. |
|------|-----------|
| 1 | 365 |
| 2 | **273** |
| 3 | **274** |
| 4 | **282** |
| 5 | **295** |
| 6 | 296 |
| 7 | 299 |
| 8 | **303** |
| 9 | 362 |
| 10 | 341 |
| 11 | 315 |
| 12 | 316 |
| Alternate | 371 |

IN THE COURT OF APPEALS

OF MARYLAND

No. 53

September Term, 2020
_____

JONATHAN TORIN KIDDER

v.

STATE OF MARYLAND
_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.
_____

Dissenting Opinion by Watts, J.,
which Getty, J. joins.
_____

Filed: August 4, 2021

Respectfully I dissent. Although the Majority concludes that the jury selection process at issue in this case "is likely not the best method for achieving the kind of jury we seek[,]" "may be inconsistent with the use of randomness in jury selection that reinforces the representativeness and inclusiveness of juries[,]" and that "trial courts should refrain from using this method of jury selection," the Majority nonetheless concludes that the jury selection process is permissible. Maj. Slip Op. at 27, 28, and 31. The Majority's holding, however, is inconsistent with our case law concerning review of a trial court's conduct during the *voir dire* process and Md. Code Ann., Cts. & Jud. Proc. (1974, 2013 Repl. Vol.) ("CJ") § 8-404(b)(2) governing jury selection, and the holding offends the principle of equal justice. For the reasons set forth herein, I would hold that in employing a method of jury selection that excluded prospective jurors from consideration solely because the jurors responded to a *voir dire* question, the Circuit Court for Worcester County abused its discretion and that the jury selection process used in this case should not be used in trial courts in our State.[1]

---

[1]In this case, we granted a petition for writ of *certiorari* filed by Jonathan Torin Kidder, Petitioner, limited to the following question:

> Did the Court of Special Appeals err by upholding the trial court's method of jury selection, which was disapproved but allowed in the Court's reported decision in *Williams v. State*, 246 Md. App. 308 (2020), whereby the trial court excluded prospective jurors from the venire based on shared characteristics, without a finding of bias?

After oral argument, this Court issued an order permitting the parties to submit supplemental briefing on the following question: "Did the trial court violate Md. Code Ann., Cts. & Jud. Proc. § 8-404(b) in the method of jury selection used at the trial in this case?"

Reasonable minds would agree that the essence of the right to a fair trial involves the selection of an impartial jury. Our case law makes clear that jurors may be excluded or struck during the jury selection process only for specific reasons. In Pearson v. State, 437 Md. 350, 357, 86 A.3d 1232, 1236 (2014), we stated that on request, a trial court must ask a *voir dire* question "if the *voir dire* question is reasonably likely to reveal specific cause for disqualification." (Cleaned up). We explained that: "There are two categories of specific cause for disqualification: (1) a statute disqualifies a prospective juror; or (2) a collateral matter is reasonably liable to have undue influence over a prospective juror." Id. at 357, 86 A.3d at 1236 (cleaned up). "The latter category is comprised of biases directly related to the crime, the witnesses, or the defendant." Id. at 357, 86 A.3d at 1236. The exclusion of 19 prospective jurors in this case was not based on either a statute that disqualified the jurors or a collateral matter that was reasonably likely to influence the

The majority opinion purports to respond to two arguments raised by Kidder—that the jury selection process "violated his right to a trial by a jury drawn from a fair cross-section of the community as guaranteed by Article 21 of the Maryland Declaration of Rights" and "that, in using this method, the trial judge impermissibly struck individuals from his jury in violation of CJ §[]8-404(b)." Maj. Slip Op. at 17 (cleaned up).

In his initial brief, Kidder contends that the jury selection process employed by the circuit court excluded "significant parts of the community without a finding of bias and was inconsistent with the policy that jurors be selected from a fair cross section of the community." The majority opinion answers Kidder's argument by developing a test that requires a defendant to prove that the method of jury selection did not systemically or intentionally exclude prospective jurors who were part of a cognizable group. Our case law demonstrates that this Court has found violations of the right to an impartial jury under Article 21 during the jury selection process without employing the test developed by the Majority. See Wright v. State, 411 Md. 503, 513, 515, 983 A.2d 519, 525, 526 (2009) and Collins v. State, 452 Md. 614, 623, 158 A.3d 553, 559 (2017). The Majority's test in this case does not apply to determining a violation of a defendant's right to an impartial jury under Article 21 during the *voir dire* process for selection of a particular jury or a violation of CJ § 8-404(b).

juror. Instead, the circuit court excluded the jurors because they responded to *voir dire* questions and the court refused to question them further to determine whether there was any valid reason to strike the jurors from service on the jury.

**Jury Selection Process in This Case**

To give a more detailed account of what occurred during the jury selection process in this case, the following description is necessary. Prior to beginning jury selection, the circuit court announced that the following jury selection process would be used. The circuit court explained that 12 jurors and 1 alternate were needed and that each party had 4 strikes (peremptory challenges) for the twelve jurors. The State had 1 challenge for an alternate juror and the defense had 2.[2] According to the circuit court, this resulted in a total number of 24 jurors needed for the jury selection process. The court explained that it would ask all of the *voir dire* questions and make note of any affirmative or negative responses by the venire panel. After doing so, the court would determine whether there were 24 jurors who had not answered affirmatively or negatively to any *voir dire* questions, *i.e.*, whether there were 24 jurors who had not answered any *voir dire* questions at all. The court stated that, "[i]f they have not answered affirmatively or negatively, there would be no reason to bring

---

[2]Under CJ § 8-420(c) and Maryland Rule 4-313(a)(1), each party is allotted four peremptory challenges during jury selection where a defendant is not subject, on any single count, to a sentence of at least twenty years of imprisonment. Given the offenses with which Kidder was charged and the maximum penalties for those offenses, each party was allotted four peremptory challenges. Under Maryland Rule 4-313(a)(4), for each alternate juror to be selected, the State is allotted one additional peremptory challenge for each defendant and each defendant is allotted two additional peremptory challenges. In this case, one alternate juror was seated.

them up to the bench for additional questioning[,] . . . then we can immediately go to alternating strikes [(peremptory challenges)] to the selection process."

Before the jury selection process began, defense counsel objected to the circuit court's proposed method of jury selection, stating, among other things, that "the method in question this morning essentially would prohibit individuals for benign reasons who would otherwise have no issues sitting in judgment of a case like this." Defense counsel argued:

> [C]ause challenges need[] to be raised by parties and ruled on by the Court. The procedure suggested by the Court, it would essentially be tantamount to the Court exercising sua sponte cause challenges without inquiring as to whether an individual would be unable to sit fairly and impartially in this case.

The circuit court overruled the objection, stating that it was not determining that "people who have answered affirmatively or negatively to any question" were unqualified and should be struck for cause.

After posing a series of *voir dire* questions to the venire panel, the circuit court determined that 46 of the 60 members of the venire panel had responded to at least one *voir dire* question, leaving 14 jurors who had responded to no questions. Defense counsel again objected to the process used by the circuit court and the court again overruled the objection. In order to arrive at the number of 24 jurors it had determined necessary for the selection process, the circuit court asked follow-up questions individually of 14 prospective jurors, who had responded to at least one *voir dire* question and struck 4 of the 14 jurors for cause. This left 10 jurors who had responded to *voir dire* questions but had not been struck for cause to join the original 14 who had not responded to any *voir dire* questions, making a total of 24 jurors who were deemed qualified to participate further in the jury selection

- 4 -

process.

The circuit court next began calling jurors in numerical order from the top of the juror list for the parties to exercise their peremptory challenges. In doing so, the circuit court skipped over 19 prospective jurors who had responded to at least one *voir dire* question, and who had not been questioned individually and had not been struck for cause. Specifically, in calling juror numbers for consideration, the circuit court skipped over prospective jurors 314, 317, 323, 327, 329, 330, 334, 336, 337, 342, 343, 345, 346, 348, 356, 359, 364, 367, and 368. On brief in this Court, Kidder identified the above prospective jurors by number as the jurors who were not permitted by the circuit court to be considered further in the selection process after responding to one or more *voir dire* questions. In the Appendix to the majority opinion, referring to what it labels the "Second Stage of Jury Selection," the Majority confirms, albeit inadvertently, that the information provided by Kidder about the 19 jurors who were skipped over is correct. Maj. Slip Op. app. at 6. The Majority states:

> Below is a list of the qualified prospective jurors, by juror number, considered at this stage of the process and the results of the process. Because neither side exercised peremptory strikes as to the alternate juror and thus three peremptory strikes were not used, 21 panel members were considered. Prospective jurors who had responded to *voir dire* questions and had been questioned individually during the first stage of jury selection are indicated in bold face type. Record Extract at 132-38.
>
> **176**    struck by defense
> **227**    struck by State
> 260    initially seated, but later struck from box by State
> **273**    seated
> **274**    seated
> **278**    struck by defense
> **282**    seated

| | |
|---|---|
| **295** | seated |
| 296 | seated |
| 299 | seated |
| **300** | struck by defense |
| **303** | seated |
| **307** | initially seated, but later struck from box by State |
| 309 | initially seated, but later struck from box by State |
| 315 | seated |
| 316 | seated |
| 341 | seated |
| 353 | struck by defense |
| 362 | seated |
| 365 | seated |
| 371 | seated as alternate |

Maj. Slip Op. app. at 6. Because the list of qualified jurors provided by the Majority starts with juror 176 (who was struck by defense) and ends with juror 371 (who was seated as an alternate), it can easily be seen that the jurors identified by Kidder on brief whose numbers range from 314 to 368 were in fact deemed not qualified by the circuit court and excluded from the selection process. The circuit court excluded 19 prospective jurors from consideration during the jury selection process without a finding of good cause or any finding whatsoever, solely because they had responded to at least one *voir dire* question.

In upholding the method of jury selection in this case, the logic of the majority opinion is that because Kidder cannot prove that the jury selected was not a fair cross section of the community, the selection process used, although disfavored, did not violate his right to an impartial jury as guaranteed by Article 21 of the Maryland Declaration of Rights or CJ § 8-404(b). See Maj. Slip Op. at 18-20, 30-31. In reaching this conclusion, quoting Wilkins v. State, 270 Md. 62, 65, 310 A.2d 39, 40-41 (1973), a case that addresses the fair cross section requirement for a county's jury pool, the Majority states that "the

requirement that a jury panel be drawn from a fair cross-section of the community 'does not mean, of course, that every jury must contain representatives of all social, religious, racial, political and geographical groups of the community …. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups.'" Maj. Slip Op. at 18-19 (ellipses in original). The Majority next announces that an inquiry concerning the validity of a jury selection process does not involve determining whether the jury selected contains a representative cross section of the community but rather involves the following test: "(1) whether the method of jury selection systematically or intentionally excluded certain prospective jurors; and (2) if so, whether those excluded constitute a 'cognizable group.'" Maj. Slip Op. at 19-20. According to the Majority, the defendant "bears the burden of establishing both propositions." Maj. Slip Op. at 20. The Majority reviews <u>Wilkins</u> and what the Majority states is the legislative history of CJ § 8-404 and concludes that the same test applies in determining whether the jury selection process violated a defendant's constitutional right to an impartial jury under Article 21 and in assessing whether the selection process violated the statute, and along the way disputes that the 19 jurors were "excluded" from the jury selection process. <u>See</u> Maj. Slip Op. at 29-31.

**Abuse of Discretion and Prejudice Standard**

Even the State does not contend that a violation of CJ § 8-404(b) is determined by the test set forth by the Majority, *i.e.*, that a defendant must demonstrate the intentional and systemic exclusion of a cognizable group of jurors to prove a violation of the statute. Rather, in its supplemental brief, the State contends that Kidder has not established a

violation of CJ § 8-404(b) because he has not demonstrated that the circuit court abused its discretion and that the jury selection process caused prejudice. Citing State v. Cook, 338 Md. 598, 610, 659 A.2d 1313, 1319 (1995), the State argues that, even if the circuit court violated CJ § 8-404(b), the violation does not merit reversal "if an unobjectionable jury is afterwards obtained." (Cleaned up). In making this argument, the State refers to Kidder's contention that that the jury selection process denied him a fair cross section of the community as "a separate class-based argument that fails[.]"

In Cook, 338 Md. at 607, 659 A.2d at 1318, we held

> that when a judge determines to remove a juror and substitute an alternate juror for a reason particular to that juror, whether the juror is removed based on the trial judge's determination of the juror's unavailability or disqualification or based on the judge's determination of some other cause for the removal of the juror, the trial judge's decision is a discretionary one and will not be reversed on appeal absent a clear abuse of discretion or a showing of prejudice to the defendant.

Our holding in Cook indicated that a trial judge's decision to strike a juror with insufficient cause would not be reversed in the absence of a clear abuse of discretion or a showing of prejudice. This is very different than the test the Majority has announced will apply to determine a violation of CJ § 8-404(b)(2). Adopting the Majority's test and concluding that a defendant must demonstrate the systematic or intentional exclusion of a cognizable group from the jury selection process would render CJ § 8-404(b)(2)'s requirement that a juror be struck from a particular jury only for cause meaningless and unenforceable. The General Assembly could not have intended such a result.

A trial judge's decision to strike a juror is reviewed for an abuse of discretion. An appellate court reviews for abuse of discretion a trial court's decision to strike prospective

jurors from a particular jury, *i.e.*, to exclude prospective jurors from jury selection. In Wright v. State, 411 Md. 503, 506-07, 983 A.2d 519, 520-21 (2009), we concluded that a trial court's "method of voir dire did not effectively ensure a fair and impartial jury," as required by the Sixth Amendment and Article 21, and we stated that "[w]e evaluate voir dire methodology under an abuse of discretion standard." (Citation omitted). In Wright, id. at 515, 506-07, 983 A.2d at 526, 520-21, we held that a trial court exceeded its discretion in "conduct[ing] voir dire by posing a roster of [seventeen] questions to the venire in quick succession, and then permitting jurors to respond only after all questions had been asked." We determined that "[t]he presentation of a lengthy roster of questions to the venire, without providing the opportunity to answer each question as it was posed, required each venireperson to comprehend and retain far too much information to guarantee that the questions were answered properly[,]" and we concluded that the *voir dire* process violated the defendant's right to a fair and impartial jury under the Sixth Amendment and Article 21. Id. at 509, 506-07, 983 A.2d at 522, 520-21. In Wright, id. at 507-08, 513, 983 A.2d at 521-22, 525, in determining a violation of Article 21, we concluded that the trial court abused its discretion using the method of *voir dire* described above and we rejected the State's contention that the defendant was not prejudiced.

To be sure, here, the trial judge did not engage in the same method of questioning the venire panel during *voir dire*, but in both Wright and this case, the judge's manner of conducting *voir dire* is at issue. In both cases, the defendant alleged a violation of Article 21. The idea of applying the test that the Majority has developed to determine a violation

of Article 21 is not supported by our holding in <u>Wright</u>, let alone the idea of applying the Majority's test to determine a violation of CJ § 8-404(b)(2).[3]

After <u>Wright</u>, in <u>Collins v. State</u>, 452 Md. 614, 617, 628, 158 A.3d 553, 555-56, 562 (2017), another case in which we considered whether the *voir dire* process violated a defendant's right to an impartial jury under the Sixth Amendment and Article 21, we stated that a trial judge's conduct of *voir dire* is reviewed for an abuse of discretion "and, when a judge's approach provides reasonable assurance that prejudice will be discovered, the

---

[3]It is worth noting that, in <u>Wright</u>, 411 Md. at 514, 983 A.2d at 525, we set forth two possible methods of conducting *voir dire*, stating:

> The key to an effective voir dire is allowing venirepersons the meaningful opportunity to digest the individual questions posed to them and to respond fully to each one while the question is at the forefront of their minds. For example, as is frequently done, the trial court may address a question to the venire as a whole, and then allow the panel members to respond to that individual question through a show of hands before moving on to the next one. The trial judge or the court clerk could make notes of which juror responded affirmatively to each question, and **after all questions are completed, call those jurors who made an affirmative response to the bench for further inquiry**. This process takes only moments longer than the procedure followed in this case. Alternately, a trial court could distribute a written list of questions to the venire prior to voir dire, and allow jurors the opportunity to note their answers as each question is asked. If this were done, jurors would have a reliable method of refreshing their memories about answers to the voir dire questions. These two methods, and no doubt several others, would ensure that voir dire serves its purpose without unduly impairing the laudable goal of judicial efficiency.

(Paragraph break omitted) (emphasis added). Nowhere in <u>Wright</u> did we state or imply that it would be permissible for a trial court, during the first stage of jury selection, to not ask prospective jurors who had responded to *voir dire* questions individual follow-up questions, not entertain motions to strike the jurors for cause, and skip over the prospective jurors during the second stage of jury selection process, all because the prospective jurors had responded to at least one *voir dire* question.

- 10 -

judge has acted within his or her discretion." (Citation omitted). In <u>Collins</u>, <u>id.</u> at 621, 158 A.3d at 557-58, the defendant argued that the trial court abused its discretion in handling the *voir dire* process and violated his right to an impartial jury by failing to invite members of the venire panel who had provided affirmative responses to approach the bench for follow-up questions and failing to inform them that they could request to answer questions at the bench. During *voir dire*, the trial court asked follow-up questions in open court. <u>See</u> <u>id.</u> at 619-20, 158 A.3d at 556-57.

The contention in <u>Collins</u> was not that the trial court failed to ask follow-up questions, but rather that the trial court asked such follow-up questions in open court and not at the bench. In <u>Collins</u>, <u>id.</u> at 623, 158 A.3d at 559, we reiterated the well-established principle that "we have said repeatedly that the trial judge is vested with broad discretion in the conduct of *voir dire*, subject to reversal for an abuse of discretion." (Citations omitted). Quoting <u>Wright</u>, 411 Md. at 508, 983 A.2d at 522, we stated that the "trial court reaches the limits of its discretion only when the voir dire method employed by the court fails to probe juror biases effectively." <u>Collins</u>, 452 Md. at 623, 158 A.3d at 559. In <u>Collins</u>, <u>id.</u> at 628, 158 A.3d at 562, we ultimately concluded that the trial court did not abuse its discretion in its manner of conducting *voir dire*. Although the outcome in <u>Collins</u> was that there was no abuse of discretion, the principle is the same—in determining whether there was a violation of Article 21, this Court reviews a trial court's conduct of *voir dire* for an abuse of discretion. The test the Majority has devised applies neither to determining a violation of Article 21 during the *voir dire* process for a particular jury nor to determining a violation of CJ § 8-404(b)(2). In sum, given that *voir dire* methodology

is reviewed for an abuse of discretion where the Sixth Amendment and Article 21 are at issue, <u>see</u> <u>Wright</u>, 411 Md. at 507, 983 A.2d at 521; <u>Collins</u>, 452 Md. at 623, 158 A.3d at 559, the same standard of review should apply to determining whether a circuit court violated CJ § 8-404(b)(2) by striking prospective jurors from a particular jury in the absence of the grounds set forth by that provision.

Here, in skipping over the 19 prospective jurors who had responded to a *voir dire* question, in seating the jury, the circuit court abused its discretion. The circuit court ensured that the 19 jurors at issue would not be available for selection and excluded the jurors in a manner that is not permitted under our case law and that violated CJ § 8-404(b)(2), which provides:

An individual who is summoned for jury service may be struck from a particular jury only:

(i) In accordance with rule or other law, by a party on peremptory challenge;

(ii) For good cause shown, by a trial judge on a challenge by a party; or

(iii) Subject to paragraph (3) of this subsection, by a trial judge who finds that:

1. The individual may be unable to render impartial jury service;

2. The individual's service likely would disrupt the proceeding; or

3. The individual's service may threaten the secrecy of a proceeding or otherwise affect the integrity of the jury deliberations

- 12 -

adversely.[4]

Indisputably, the circuit court failed to use any of the prerequisites necessary for excluding a prospective juror from a particular jury under CJ § 8-404(b)(2). The circuit court never gave the parties an opportunity to exercise peremptory challenges on any of the 19 prospective jurors. The circuit court never gave the parties an opportunity to move to strike any of the 19 prospective jurors for cause—much less found that any of the 19 prospective jurors' responses to *voir dire* questions constituted good cause to strike them. The circuit court never found that any of the 19 prospective jurors may have been unable to render impartial jury service.[5] By excluding the 19 prospective jurors without any grounds for doing so, the circuit court clearly violated CJ § 8-404(b)(2) and rendered meaningless its mandate that prospective jurors may be struck only under the circumstances provided for by the statute. The circuit court violated the plain language of CJ § 8-404(b)(2) and its obvious purpose of ensuring that prospective jurors are struck from a venire panel only on a basis forth in the statute by the General Assembly and not

---

[4]In turn, CJ § 8-404(b)(3) states that "[a] trial judge may not strike an individual under paragraph (2)(iii)3 of this subsection, unless the judge states on the record: (i) Each reason for the strike; and (ii) A finding that the strike is warranted and not inconsistent with §§ 8-102(a) and (b) and 8-104 of this title." (Paragraph breaks omitted). CJ § 8-404(b)(2)(iii)3 and (b)(3) are not pertinent here because there is no indication that the service of any of the 19 prospective jurors at issue may have "threaten[ed] the secrecy of a proceeding or otherwise affect[ed] the integrity of the jury deliberations adversely."

[5]CJ § 8-404(b)(2)(iii) does not allow a circuit court to *sua sponte* strike a prospective juror on the ground of a possible inability to render impartial jury service. CJ § 8-404(b)(2)(iii) provides, among other things, that a juror may not be stuck from a particular jury unless the "trial judge [] **finds** that[ t]he individual may be unable to render impartial jury service[.]" (Emphasis added). The circuit court made no such finding as to any of the 19 prospective jurors at issue.

- 13 -

for arbitrary and capricious, or perhaps other more troubling, reasons.

In this case, the exclusion of the 19 prospective jurors resulted in prejudice. The Majority seeks to minimize the circumstance that the circuit court excluded the 19 prospective jurors from the selection process by stating that, even if the circuit court had not engaged in the instant method of jury selection, "most of those prospective jurors would not have been considered for [Kidder's] jury because they would not have been reached." Maj. Slip Op. at 20 n.20. According to the Majority, "only five additional jurors with numbers greater than 314 were seated on the jury." Maj. Slip Op. at 20 n.20. This observation demonstrates that Kidder was prejudiced by the jury selection process. By the Majority's own admission 5 jurors with numbers higher than 314 were seated on the jury rather than potentially 5 of the prospective jurors who were excluded by the circuit court from the jury selection process. As the Majority has acknowledged, although inadvertently, the circuit court seated 5 jurors on the jury who might not otherwise have been selected if the circuit court had allowed the 19 excluded jurors to participate in the jury selection process. This is a demonstration of prejudice.

**Prospective Jurors Were Struck Within the Meaning of CJ § 8-404(b)(2)**

As a basic point, I disagree with the Majority's conclusion that jurors were not excluded, *i.e.*, struck, from the jury selection process because they responded to *voir dire* questions. The majority opinion determines that jurors were not excluded from the jury selection process for responding to *voir dire* questions because "14 prospective jurors who had responded to the trial court's initial *voir dire* questions were, in fact, subject to further questioning, [] 10 of those prospective jurors advanced to the peremptory strike stage, and

- 14 -

[] five of them eventually were seated on Mr. Kidder's jury[,]" and that because only 24 of the 60 venire panel members were needed, "36 members of the panel would not be involved in the second stage of jury selection."[6] Maj. Slip Op. at 22. The Majority raises red herrings with these determinations. Contrary to the Majority's reasoning, Kidder has never contended that the 14 jurors who responded initially to *voir dire* questions and were asked additional questions individually were excluded from the jury selection process. It is undisputed that this group of 14 jurors was permitted to fully participate in the jury selection process and that from this group the circuit court culled the additional 10 jurors necessary to reach its goal of 24 qualified jurors. (Four of the 14 jurors were struck for cause after individual questioning.) This group of 14 jurors is distinct from the 19 jurors who answered *voir dire* questions, were never questioned individually or subject to any motion to strike for cause, and who were not allowed to participate in the jury selection process after responding to a *voir dire* question. Because the circuit court did not do the same thing to other jurors who responded to a *voir dire* question does not mean that the court did not improperly exclude the 19 jurors at issue in violation of CJ § 8-404(b)(2).

The group of 19 jurors at issue have juror numbers higher than number 176, the first

---

[6]The Majority notes that, at the outset of jury selection process, the circuit court stated that, in engaging in its method of jury selection, the court was "not determining qualified versus unqualified" and was "not even remotely close to determining[] that people who have answered affirmatively or negatively to any question that they are not qualified jurors, and that they should therefore be stricken for cause." Maj. Slip Op. at 13. Wisely, the Majority does not conclude that in skipping over the 19 prospective jurors, the circuit court did not make a determination that the jurors were not qualified. It is plain that had the jurors remained silent and not answered a *voir dire* question, the 19 jurors would have been considered qualified to move on to the second stage of the jury selection process.

- 15 -

juror number called for consideration during the second stage of the jury selection process, and lower than number 371, the number of the alternate seated. Yet, a review of the transcript reveals that the jurors were not included in the jury selection process even though the circuit court began calling numbers at the top of the list, *i.e.*, the lowest juror number first. As such, the 19 jurors are not the equivalent of a hypothetical group of 36 jurors who may randomly have not been reached in the jury selection process. The 19 jurors were purposefully not allowed to be considered because they responded to a *voir dire* question.

In short, the Majority's reasoning that the instant method of jury selection did not violate Article 21 and CJ § 8-404(b)(2) because the 19 prospective jurors at issue were not "excluded" or struck from a particular jury is not persuasive. See Maj. Slip Op. at 22. The 19 prospective jurors at issue were most certainly excluded from the jury selection process in this case and thereby effectively struck from the process. By skipping over the 19 prospective jurors, the circuit court intentionally excluded the jurors from the selection process, guaranteeing that none of them would be part of the jury that was ultimately seated. The 19 prospective jurors at issue were just as unable to be included in the jury as the prospective jurors whom the circuit court officially struck for cause. The Majority's conclusion that the "prospective jurors were not 'excluded' from the jury; they simply were not reached" is nothing more than an exercise in semantics.[7] Maj. Slip Op. at 22.

---

[7]The relevant definition of the word "exclude" in Merriam-Webster is "to bar from participation, consideration, or inclusion[.]" *Exclude*, Merriam-Webster, https://www. merriam-webster.com/dictionary/exclude [https://perma.cc/U4KX-ZQ7M]. The relevant definition of the word "strike" in Merriam-Webster is to "delete" or "cancel[.]" *Strike*, Merriam-Webster, https://www.merriam-webster.com/dictionary/strike [https://perma.cc/

I am unpersuaded by the position that the circuit court did not strike the 19 prospective jurors at issue because the circuit court merely took actions authorized by Maryland Rule 4-312(f) and (g)(1).  See Maj. Slip Op. at 22.  Maryland Rule 4-312(f) and (g)(1) provide that, before the exercise of peremptory challenges, a trial court shall "prescribe the order to be followed in selecting individuals from the list[,]" Md. R. 4-312(f), and that "[t]he individuals to be impaneled as sworn jurors, including any alternates, shall be called from the qualified jurors remaining on the jury list in the order previously designated by the trial judge[,]" Md. R. 4-312(g)(1).  These provisions do not supersede CJ § 8-404(b)(2) or authorize a circuit court to exclude prospective jurors because they responded to a *voir dire* question.  In other words, Maryland Rule 4-312(f) and (g)(1) do not provide a green light for a trial judge to systematically strike jurors for any or no reason at all.  Maryland Rule 4-312(f) and (g)(1) do not authorize a circuit court to cherry-pick which prospective jurors to use during the selection process.  The Rules do not give a circuit court a blank check to ignore its obligation to comply with CJ § 8-404(b)(2) and skip over, *i.e.*, strike, prospective jurors who respond to *voir dire* questions nor do the Rules require that such a practice be upheld.

More importantly, the instant method of jury selection did not involve prescribing

WA39-NGLS] (capitalization omitted).  The legal definition of the word "strike" in Meriam-Webster is "to remove (a prospective juror) from a venire[.]"  Id.  Similarly, the definition of the word "strike" in Black's Law Dictionary is "[t]o remove (a prospective juror) from a jury panel by a peremptory challenge or a challenge for cause."  *Strike (vb.)*, Black's Law Dictionary (11th ed. 2019).  In this case, the circuit court's exclusion of the 19 prospective jurors from consideration during the jury selection process was the equivalent of deleting or removing them from the venire panel, *i.e.*, excluding or striking the jurors.

- 17 -

the order to be followed in selecting prospective jurors from the list, for example, deciding whether to call the juror numbers from the top or bottom of the list. Rather, the selection process constituted knowingly excluding prospective jurors from the jury selection process because the jurors responded to a *voir dire* question—a reason not permitted under CJ § 8-404(b)(2). Nowhere in CJ § 8-404(b)(2) did the General Assembly state that a circuit court may shorten the jury selection process by identifying through *voir dire* jurors who may have life experiences and beliefs that require further questioning and simply exclude those jurors from the selection process. It is precisely this type of mischief and even greater potential harm that CJ § 8-404(b)(2) is meant to prevent.

**Relevant Case Law and Legislative History of CJ § 8-404(b)**

Our holding in Wilkins, 270 Md. 62, 310 A.2d 39, does not apply to determining whether a trial court's method of *voir dire* violates a defendant's right to an impartial jury under Article 21 or to CJ § 8-404(b). In Wilkins, 270 Md. at 63, 310 A.2d at 39, before trial, the defendant challenged the jury array[8] alleging that the use of the 1970 list of Prince George's County's registered voters for the selection of jurors was a denial of due process.[9] We observed that the precise issue raised by the defendant was a "novel one" in that the question presented by the defendant's challenge was: "Were the otherwise eligible voters of Prince George's County who failed to register for the 1970 election a cognizable or

---

[8]It is clear from the circumstances of the case that the challenge to the "jury array" did not involve a challenge to the particular jury chosen to serve in the case, but rather to either the venire panel or an even larger group.

[9]In Wilkins, 270 Md. at 63, 310 A.2d at 39, we adopted, with minor editing, the reported opinion of the Court of Special Appeals on the issue before us.

identifiable group or class for purposes of jury selection?" Id. at 66-67, 310 A.2d at 41. In framing the issue, we explained that, if the eligible voters who failed to register "constitute such a definitive class, use of the 1970 registered voters list systematically, if not intentionally, excluded the class from jury service. If the nonregistered voters were not a 'cognizable' class, then their exclusion from jury service offended no constitutional or statutory right possessed by the" defendant. Id. at 67, 310 A.2d at 41. In analyzing the question, we noted:

> In 1969, Maryland adopted a uniform and comprehensive statute governing the selection of jurors throughout the political subdivisions of the State. The policy which underlies the statute is set forth in Code (1957, 1972 Repl. Vol.) Art. 51, s 1 which reads as follows:
>
> 'Whenever a litigant . . . is entitled to trial by jury, he shall have the right to a petit jury selected at random from a fair cross section of the citizens of this State resident in the county wherein the court convenes . . .. Whenever a person is accused of an indictable criminal offense . . ., he shall have the right to a grand jury selected at random from a fair cross section of the citizens of this State resident in the county wherein the court convenes . . .. All citizens of this State (1) shall have the opportunity to be considered for service on grand and petit juries in the courts of this State by maintaining their names on the roll of registered voters for State elections. . . .'

Wilkins, 270 Md. at 63-64, 310 A.2d at 40 (internal quotation marks and ellipses in original) (footnote omitted). We observed that Art. 51, § 1 (the predecessor of CJ § 8-104, which states that "[e]ach jury for a county shall be selected at random from a fair cross section of the adult citizens of this State who reside in the county.") incorporates the constitutional requirement that a defendant is entitled to trial by a jury selected from a fair cross section of the community. See Wilkins, 270 Md. at 64-65, 310 A.2d at 40. We rejected the defendant's challenge and concluded "that nonregistered voters [do not]

constitute a cognizable group of persons in the community." Id. at 68-69, 310 A.2d at 42. This is the sum of the holding in Wilkins.

The holding in Wilkins does not involve a challenge under Article 21 based on the use of an improper *voir dire* method or the striking of an individual juror during the jury selection process, let alone a violation of CJ § 8-404(b)'s predecessor (Art. 51, § 9). Even the State recognizes that Kidder's claim that the jury selection method in this case denied him a fair cross section of the community was a separate class-based argument that did not pertain to the allegation that the selection method violated CJ § 8-404(b). The holding in Wilkins demonstrates that the test developed by the Majority—that the defendant must prove a systemic or intentional exclusion of a cognizable group of the community—does not apply to an allegation that a trial court's *voir dire* method violated Article 21 and CJ § 8-404(b).

Likewise, nothing in the legislative history of CJ § 8-404 that the Majority cites leads to the conclusion that a violation of the statute is to be determined based on the standard or test announced by the Majority, *i.e.*, the systematic or intentional exclusion of a cognizable group. See Maj. Slip Op. at 29-31. Rather, the legislative history of the statute leads to exactly the opposite conclusion. In discussing the legislative history of CJ § 8-404, the Majority states that the earliest predecessor of the statute, Md. Code Ann., Art. 51, § 9, was "part of the law on which the *Wilkins* decision . . . was based." Maj. Slip Op. at 29 (citing Wilkins, 270 Md. at 63, 310 A.2d at 40). I, respectfully, disagree that Wilkins provides any insight into the applicable legislative history of CJ § 8-404(b). As explained above, our holding in Wilkins concerned a different statute altogether—Art. 51, § 1, a

- 20 -

predecessor of CJ § 8-104, which "incorporate[d] the constitutional requirement that a defendant is entitled to trial by a jury selected from a fair cross section of the community in which he is being tried." Id. at 64-65, 310 A.2d at 40 (cleaned up). Art. 51, § 1 was at issue in Wilkins because the defendant contended that the use of the list of Prince George's County's registered voters for selection of jurors in his county did not result in a group or class of persons from a fair cross section of the community. See id. at 68, 310 A.2d at 42.

Nowhere in Wilkins did we mention the predecessor of CJ § 8-404 in effect at the time, which was Md. Code Ann., Art. 51, § 9. In other words, Art. 51, § 9 had nothing to do with our holding in Wilkins. In Wilkins, we began our discussion of the relevant law by observing that, "[i]n 1969, Maryland adopted a uniform and comprehensive statute governing the selection of jurors throughout the political subdivisions of the State." Wilkins, 270 Md. at 63, 310 A.2d at 40 (cleaned up). In a footnote that immediately followed that sentence, we provided the citation: "See Chap. 408 of the Acts of 1969, now codified as Code (1957, 1972 Repl.Vol.) Art. 51, ss 1-13 incl." Id. at 63 n.1, 310 A.2d at 40 n.1. Although we cited in a footnote the act through which the General Assembly enacted thirteen statutes governing jury selection—i.e., "Chap. 408 of the Acts of 1969, now codified as Code (1957, 1972 Repl.Vol.) Art. 51, ss 1-13 incl.[,]" id. at 62 n.1, 310 A.2d at 40 n.1—we did not address Art. 51, § 9 (CJ § 8-404's predecessor) or quote any of the language in that particular statute. In setting forth the legal backdrop in Wilkins, we merely cited the act in which the General Assembly enacted multiple statutes governing jury selection, including Art. 51, § 9. Nowhere in Wilkins did we quote, discuss, or purport

to discuss Art. 51, § 9. Rather, our holding in <u>Wilkins</u> concerned Art. 51, § 1, the predecessor of a different statute than CJ § 8-404.

The majority opinion has not set forth anything in the legislative history of CJ § 8-404 that would lead to the conclusion that the statute incorporates the standard that the Majority wants to apply. All the Majority has done is suggest that a predecessor statute is cited in one of our cases, <u>Wilkins</u>, and that is not entirely accurate. Art. 51, § 9 is not cited in <u>Wilkins</u>. As explained, the overall act containing multiple statutes is simply cited in a footnote. Even if Art. 51, § 9 had been mentioned in <u>Wilkins</u>, which it was not, that would not be part of the legislative history of the statute. The predecessor statute would merely have been mentioned in an opinion issued by this Court. That this Court might have mentioned a statute in an opinion does not constitute legislative history of the statute. Such a mention gives no indication of legislative intent. The point of examining the legislative history of a statute is to ascertain and effectuate the intent of the General Assembly in enacting or amending the statute. As we observed in <u>State v. Thomas</u>, 465 Md. 288, 301, 214 A.3d 132, 140 (2019), "[s]tatutory interpretation is an effort to discern and carry out the intent of the Legislature." "That effort begins with an examination of the statutory text, usually continues with a review of the legislative history to confirm conclusions drawn from or resolve questions raised by the text, and may also include consideration of the consequences of alternative readings of the statute." <u>Id.</u> at 301, 214 A.3d at 140 (citation omitted). Our holding in <u>Wilkins</u> has nothing to do with CJ § 8-404 and, equally important, our holding in <u>Wilkins</u> is not part of the statute's legislative history.

In discussing the legislative history of CJ § 8-404, the Majority also refers to a Committee Note regarding the 2006 amendments to CJ § 8-404. This Committee Note supports the conclusion that the standard for determining a violation of CJ § 8-404(b)(2) is not the same as the standard for determining a violation of CJ § 8-104. Regarding the 2006 amendments to CJ § 8-404, the Committee Note states that, in CJ § 8-404(a), (b)(2), (b)(3), (b)(4), and (c)(1), "references to a 'trial' judge and to 'strik[ing]' an individual [were] substituted for the former reference to the individual being 'excused' or 'disqualified, excused, or excluded' by 'the court' then defined as a 'circuit court' to distinguish actions of a bench, jury commissioner, or jury judge." 2006 (Reg. Sess.) Md. Laws 2019, 1987 (Vol. III, Ch. 372, H.B. 1024) (first alteration in original). CJ § 8-404 applies to broader circumstances than a trial judge striking a prospective juror from a jury under CJ § 8-404(b)(2). CJ § 8-404(b)(1) provides that "[w]henever more individuals than are needed to impanel a jury have been summoned, an individual may be excused but only in accordance with rule or other law." The Committee Note refers to changes to provisions within CJ § 8-404 other than CJ § 8-404(b)(1).

It is clear that CJ § 8-404(b)(1) pertains to the authority of jury commissioners and jury judges to excuse people who were summonsed for jury duty and as amended CJ § 8-404(b)(2) pertains to the authority of a trial judge to strike an individual from a particular jury. Commonsensically, if an individual who was summonsed for jury duty may be excused by jury commissioners and jury judges under CJ § 8-404(b)(1) "only in accordance with rule or other law[,]" a trial judge's authority to strike a juror under CJ § 8-404(b)(2) is intended to be limited to the grounds set forth by law in that paragraph of the statute. It

can readily be seen that the overall intent of the 2006 amendment to CJ § 8-404 as reflected in the Committee Note was to ensure that prospective jurors are excused from jury service or struck from a particular jury only for reasons based in law.

In its supplemental brief, even the State asserts that, in light of the Committee Note, it appears that CJ § 8-404(b)(1) applies to jury commissioners and jury judges, whereas CJ § 8-404(b)(2) and (b)(3) apply to parties and trial judges. The Committee Note demonstrates that CJ § 8-404(b)(2) was amended to include the word "struck" to make clear that the provision applies to trial judges during the selection of a particular jury, as opposed to jury commissioners or jury judges during the assembly of a jury pool. By amending CJ § 8-404(b)(2) to refer to a trial judge and to striking a juror, the General Assembly made clear its intent for CJ § 8-404(b)(2) to apply to the conduct of trial judges striking jurors in the selection of a particular jury, which indicates that a violation of CJ § 8-404(b)(2) would not be controlled by the same standard for determining whether a fair cross section of the community is represented in a jurisdiction's jury pool under CJ § 8-104.

Determining a violation of CJ § 8-104 and CJ § 8-404(b) are two separate matters. A determination that the requirement of CJ § 8-104 has been met does not absolve the circuit court of violating CJ § 8-404(b)(2) or, for that matter, of engaging in a jury selection practice that should not be permitted in Maryland. CJ §§ 8-104 and 8-404(b)(2) set forth different requirements, and both must be separately complied with. Even where the requirements of CJ § 8-104 have been satisfied with respect to the venire panel, CJ § 8-

404(b)(2) sets forth additional protections that prohibit a trial court from excluding prospective jurors from jury selection without a basis specified by the statute.

**Consequences of Legitimizing Jury Selection Process Used in This Case**

Unfortunately, in this case, the Majority seemingly adopts the Court of Special Appeals's holding in Williams v. State, 246 Md. App. 308, 340, 228 A.3d 822, 840 (2020) that the instant method of jury selection, though disfavored, is not *per se* impermissible.[10] See Maj. Slip Op. at 26. Playing down the consequences, the Majority cautions that the selection process used by the circuit court in this case could result in a jury that "may not be as attentive and engaged as we want our juries to be." Maj. Slip Op. at 31. In Williams, Md. App. at 320, 228 A.3d at 828-29, though, the Court of Special Appeals warned that

---

[10]The same circuit court judge presided over the trials in this case and in Williams, 246 Md. App. 308, 228 A.3d 822. In each case, the circuit court judge indicated that the instant method of jury selection was referenced in a list of common methods of jury selection in the 2015-2016 Report of the Special Committee on Voir Dire of the Maryland State Bar Association. See id. at 326, 228 A.3d at 832. The list of common methods of jury selection to which the circuit court referred, however, was not part of the report itself. See Maj. Slip Op. at 11 n.6. The list of common methods of jury selection was a separate document. The list did not in any way endorse the instant method of jury selection. Rather, the reference to the instant method of jury selection expressly stated that "only a few judges" used the method. In Williams, 246 Md. App. at 347 & n.4, 228 A.3d at 844-45 & n.4, the Court of Special Appeals expressly stated that the 2015-2016 Report of the Special Committee on Voir Dire of the Maryland State Bar Association had been superseded by the 2018 version of the "Maryland State Bar Association's publication *Jury Selection Questions for Criminal and Civil Trials*[,]" which left out the reference to the instant method of jury selection. See also The Maryland State Bar Association, Inc., *Model Jury Selection Questions for Criminal Trials*, MJSQ MD-CLE 1, *Model Jury Selection Questions for Civil Trials*, MJSQ MD-CLE 37 (2018). The Court of Special Appeals stated that the instant method of jury selection was omitted from the Maryland State Bar Association's publication, in its view, "for good reason" and observed that "the purpose of *voir dire* is not to select a jury of people who are pristinely or ignorantly unaware[.]" Williams, 246 Md. App. at 347, 228 A.3d at 844-45.

- 25 -

"the method used to select the jury in this case risks excluding members of the venire in ways the Constitution forbids and, as a result, seems to undermine the judicial economy objectives it seeks to achieve." Nonetheless, the Majority upholds this method of jury selection.

We should not approve a method of jury selection that, as the Majority and the Court of Special Appeals have expressly acknowledged, "trial courts should refrain from using[,]" Maj. Slip Op. at 31, and is disfavored and undesirable, see Williams, 246 Md. App. at 320, 228 A.3d at 828-29. Given that, as the Majority indicates, trial courts should refrain from engaging in this method of jury selection, our holding should be that this method of jury selection is not permitted. It is obvious that the method of jury selection used in this case may potentially be used to cause even more harm than what occurred here and in Williams.

In addition to sanctioning a jury selection process that is rife for great misuse and violates CJ § 8-404(b)(2), the reasoning of the Majority in this case is unpersuasive because, under the standard that the Majority adopts—that a defendant must prove systematic or intentional exclusion of a cognizable group from the jury selection process see Maj. Slip Op. at 20—few, if any, defendants would be able to prove that the instant method of jury selection actually met the standard. Where a trial court excludes without further questioning jurors who responded to *voir dire* questions, there will be little to no information that can be known about the jurors who were excluded, except that they responded to certain *voir dire* questions. One of the negative consequences of the instant method of juror selection is that it deprives an appellate court of any information to

- 26 -

consider when deciding whether it was appropriate for jurors to have been struck.

A defendant will be unlikely to ever prove the intentional or systemic exclusion of a cognizable group from the jury selection process. Even in the event, for example, that all or most jurors excluded by the selection process are members of an identifiable race or gender, under the Majority's reasoning a defendant would be unlikely to be able to prove intentional exclusion of a cognizable group by a trial court. Using the Majority's standard, with this method of jury selection, a defendant's counsel would be required to observe the venire panel during *voir dire* and gather information about the characteristics of the prospective jurors who were excluded and the questions that they responded to in an attempt to determine whether the information gathered produced evidence of the systemic exclusion of a cognizable group. It would be an understatement to say that this would be difficult to do.

On a related note, quoting Wilkins, 270 Md. at 65, 310 A.2d at 40-41, the Majority states that "the requirement that a jury panel be drawn from a fair cross-section of the community 'does not mean, of course, that every jury must contain representatives of all social, religious, racial, political and geographical groups of the community …. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups.'" (Ellipses in original). Maj. Slip Op. at 18-19. Plainly, this language taken from Wilkins does not apply to the selection of a particular jury in an individual case. We have long recognized the use of Batson challenges[11] to

---

[11]Batson v. Kentucky, 476 U.S. 79 (1986).

prohibit parties from using peremptory challenges impermissibly to exclude individual members of a venire panel from a particular jury. We do not require the proponent of a Batson challenge to prove a systemic or intentional exclusion of a cognizable group.

There is no realistic process by which a defendant might go about satisfying the test that the majority opinion sets forth. Under the Majority's standard, assuming a defendant's counsel could gather sufficient information during the *voir dire* process to raise a challenge, a defendant's counsel would be unable to question the trial judge as to the trial judge's reason for using the jury selection process at issue or excluding the prospective jurors in question. This is unlike the process where a party moves to strike an individual juror and, if the request is denied, a record is available for an appellate court to review the trial court's ruling.

In this case, though, in addition to the prejudice discussed above, it can be seen that the circuit court's violation of CJ § 8-404(b)(2) had identifiable consequences. The jury was empaneled from a group of 24 prospective jurors, of whom 14—more than half—had not responded to any *voir dire* questions. What is known of the jurors who did not respond to *voir dire* questions and who were seated as jurors is that they had limited experience with the criminal justice system or as the Majority acknowledges that the jurors may have been inattentive or not listening to the *voir dire* questions. See Maj. Slip Op. at 27 n.24, 31. For example, none of the 14 prospective jurors acknowledged having been the victim of a crime similar to the ones Kidder was charged with, or having an immediate family member who had been the victim of a crime similar to the ones with which Kidder was charged. None of the 14 prospective jurors acknowledged having been a witness to a crime;

- 28 -

having been arrested for, charged with, or convicted of a crime other than a minor motor vehicle violation; or having an immediate family member who met either of these criteria. None of the 14 prospective jurors acknowledged having been, or having an immediate family member who had been, a member of a law enforcement agency.[12]

On the other hand, what is known about the 19 jurors who were excluded from the jury selection process is that they responded to at least one *voir dire* question concerning, for instance, having been a victim of crimes similar to the ones Kidder was charged with in this case or having an immediate family member who had been, or having been a witness to a crime, or having been arrested, charged, convicted of a crime, or having an immediate family member who had been. The instant method of jury selection favored the selection of jurors with less relevant life experience or experience with the criminal justice system over jurors with potentially more or broader such experience who may not have been struck for cause had the circuit court complied with CJ § 8-404(b)(2). In this sense, at a minimum, the jury selection process offends the principle of equal justice and the concept of the random selection of juries.

By condoning the instant method of jury selection, the Majority endorses a disfavored method of jury selection that violates Article 21 and CJ § 8-404(b)(2) and risks

---

[12]No prospective juror responded to the following three *voir dire* questions: "Do any of you have strong feelings about the crimes with which the defendant is charged?"; "[A]re you related by blood or marriage to the defendant, or do you know the defendant from any business or social relationship?"; and "[D]o you know or are you familiar with [the victim] through any contact or in any capacity?" The circumstance that no prospective juror responded to these *voir dire* questions in this case is mere happenstance; the instant method of jury selection would have excluded a prospective juror who responded to any *voir dire* question.

excluding jurors from the jury selection process in a manner that is antithetical to the concept of equal justice. Although the Majority says that trial judges should refrain from using it, in legitimizing this practice the Majority makes it more likely that the practice will be used in Maryland circuit courts and increases the likelihood that defendants will not receive fair trials in our State.

For the above reasons, respectfully, I dissent.

Judge Getty has authorized me to state that he joins in this opinion.